**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| United States of America,<br><br>     Plaintiff,<br><br>  v.<br><br>President and Fellows of Harvard College,<br><br>     Defendant. | Civ. No. 1:26-cv-10844<br><br>**AMENDED COMPLAINT**<br>**FOR DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |

Harvard University is not complying with multiple federal investigations. It unlawfully has withheld from the United States Department of Justice and the United States Department of Education information necessary to determine whether Harvard, which has a recent history of racial discrimination, is continuing to discriminate in its admissions process.

In 2023, the Supreme Court held that Defendant President and Fellows of Harvard College ("Harvard") violated Title VI of the Civil Rights Act of 1964 by considering race in its undergraduate admissions process. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*"). Harvard used race as "a negative factor" and a "pernicious stereotype" and maintained an "obvious" "numerical commitment" to "[o]utright racial balancing." *Id.* at 218–23. The result was a significant "decrease in the number of Asian-Americans admitted to Harvard." *Id.* at 218.

Over one year ago, in April 2025, the Department of Justice initiated compliance reviews of Harvard's undergraduate, medical-school, and law-school programs to determine whether Harvard continues to unlawfully discriminate against applicants for admission on the ground of race. In May 2025, the Department of Education initiated a similar review of Harvard's

undergraduate admissions.

But the United States is unable to determine whether Harvard is following the law. Both the Department of Justice and the Department of Education have requested anonymized, applicant-level admissions data. Harvard has not provided this information. Harvard's refusal to cooperate with these investigations violates federal law. As a recipient of Department of Justice and Department of Education funding, Harvard is required by federal regulations and its own contracts to cooperate with the compliance reviews. But at every turn, Harvard has thwarted federal efforts to investigate potential discrimination. It has slow-walked the pace of production and refused to provide pertinent documents relating to applicant-level admissions decisions.

"Eliminating racial discrimination means eliminating all of it." *Id.* at 206. The documents requested by the United States will help assess whether Harvard is complying with federal law or whether Harvard is defying Title VI and the Supreme Court's ruling in *SFFA*. The United States of America therefore brings this civil action solely to compel Harvard to produce documents relating to any consideration of race in admissions. In this suit, the United States does not accuse Harvard of any discriminatory conduct, nor does it seek monetary damages or the revocation of federal funding.

## PARTIES

1.     Plaintiff is the United States of America. The United States provides significant financial assistance to Harvard.

2.     Defendant President and Fellows of Harvard College is the legal entity encompassing Harvard University, a private university in Massachusetts.

3.     Harvard receives financial assistance from several federal agencies, including the Department of Justice and the Department of Education.

4.      Harvard is a "program or activity" within the meaning of Title VI because it is "a college, university, or other postsecondary institution."  42 U.S.C. § 2000d-4a(2)(A).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (c)(2).

## FACTS

### I.    Harvard University

7.      Harvard enrolls approximately 24,500 students and employs approximately 2,350 academic faculty.[1]

8.      Admission to Harvard is extremely competitive.  Harvard College admitted 4.2% of applicants for the class of 2029.[2]  Harvard Law School admitted 9.2% of applicants for the class of 2028.[3]  Harvard Medical School admitted 3.2% for the entering class in 2025.[4]

9.      Harvard is one of the world's wealthiest universities.  It enjoys a $56.9 billion endowment and charges undergraduate students $86,926 per year for tuition, room and board, and other expenses.[5]

10.     Harvard receives very generous subsidies from American taxpayers.  In 2024, Harvard received $686 million in federal research funding, which amounts to 11% of its annual operating budget.[6]  Under its currently active grants, Harvard will receive over $2.6 billion of federal financial assistance, including approximately $650,000 from the Department of Justice and

---

[1] https://www.harvard.edu/about/; https://oira.harvard.edu/factbook/fact-book-faculty-staff/
[2] https://college.harvard.edu/admissions/admissions-statistics
[3]  https://hls.harvard.edu/jdadmissions/apply-to-harvard-law-school/jdapplicants/hls-profile-and-facts/
[4] https://hms.harvard.edu/about-hms/facts-figures
[5] https://www.harvard.edu/about/endowment/; https://registrar.fas.harvard.edu/tuition-and-fees
[6] https://www.harvardmagazine.com/2025/07/harvard-trump-research-cuts

$12 million from the Department of Education.  Harvard also participates in student financial assistance programs authorized by Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070, *et seq.*, and administered by the Department of Education.

11.    Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

12.    As a "program or activity" that receives federal funding, Harvard must comply with Title VI.  42 U.S.C. § 2000d.  This means that Harvard may not discriminate against any students on the ground of race.

13.    Notwithstanding the requirements of Title VI and Harvard's then-existing contracts with the federal government, which prohibited discrimination on the basis of race, Harvard recently has discriminated on the ground of race in its undergraduate admissions.  *See generally SFFA.*

## II.    The Department of Justice investigates Harvard

*A.    Harvard's obligations as a recipient of financial assistance from the Department of Justice*

14.    Harvard currently is the recipient of a grant from the Department ("DOJ Grant"), entitled "Evaluating Processes and Outcomes of Housing Models for Victims of Human Trafficking." Ex. A at 1.  The award amount is $654,195.  The original budget period end date was December 31, 2025, *id.*, but the grant was extended and now will expire on December 31, 2026, Ex. B at 1.

15.    The DOJ Grant is a legally binding contract between Harvard and the Department of Justice.

16.     The DOJ Grant informs Harvard that "recipients of federal financial assistance" must "give assurances that they will comply" with Title VI.  Ex. A at 3.

17.     The DOJ Grant contains a provision requiring Harvard to "comply with all applicable requirements of 28 C.F.R. Part 42," which includes the Department of Justice's regulations implementing Title VI.  Ex. A at 13.

18.     The Department of Justice's Title VI regulations require "[e]very application for Federal financial assistance" to "contain or be accompanied by an assurance that the program will be conducted … in compliance with all requirements imposed by or pursuant to this subpart [Subpart C]." 28 C.F.R. § 42.105(a)(1).  The regulations further provide that "such assurance shall obligate the recipient for the period during which Federal financial assistance is extended pursuant to the application." *Id.*

19.     Subpart C parrots Title VI and states, "No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this subpart applies." 28 C.F.R. § 42.104(a).

20.     Subpart C contains additional prohibitions of "[s]pecific discriminatory actions." 28 C.F.R. § 42.104(b).  For example, recipients of federal funding may not discriminate "on the ground of race, color or national origin" in any of the following ways:

> (i) Deny an individual any disposition, service, financial aid, or benefit provided under the program; (ii) Provide any disposition, service, financial aid, or benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program; (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any disposition, service, financial aid, or benefit under the program; (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any disposition, service, financial aid, or benefit under the program; (v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership, or other requirement or

condition which individuals must meet … [or] (vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program.

*Id.*

21.     Subpart C requires recipients of federal funding to submit "timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the responsible Department official or his designee may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this subpart." 28 C.F.R. § 42.106(b).

22.     Subpart C requires recipients of federal funding to "permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities, as may be pertinent to ascertain compliance with this subpart." 28 C.F.R. § 42.106(c).

23.     Subpart C allows the Department of Justice to "from time to time review the practices of recipients to determine whether they are complying with" Title VI and its implementing regulations. 28 C.F.R. § 42.107(a).

24.     The Department of Justice accordingly has the right to review Harvard's compliance with Title VI, and Harvard must permit the Department of Justice to access "pertinent" information as part of its review.

   B.     *Harvard fails to cooperate with the Department of Justice's investigation of its admissions practices*

25.     In April 2025, the Department of Justice opened an investigation of Harvard's compliance with Title VI.

26.     On April 11, 2025, the Department of Justice sent Harvard College a letter "request[ing] information regarding [its] admission policies and compliance with the Supreme

6

Court's decision in *Students for Fair Admissions*."  Ex. C at 1.  The Department of Justice requested that Harvard "certify that [it] does not use race as a factor in making admissions decisions" or "in awarding any scholarships, financial assistance, or other benefits to current or prospective students."  *Id.*  The Justice Department also asked Harvard College to produce documents to "support this certification," including "any and all relevant documents guiding your admissions policies and procedures" and "all admissions data for the past five academic years, including applicant test scores (SAT/ACT), GPA, extracurricular activities, essays, and admission outcomes, disaggregated by race and ethnicity."  *Id.*  The Department of Justice asked Harvard College to "send the requested information by April 25."  *Id.* at 2.

27.     On April 18, 2025, the Department of Justice sent Harvard Law School a materially identical letter.  The Justice Department requested that Harvard Law School "certify that [it] does not use race as a factor in making admissions decisions" or "in awarding any scholarships, financial assistance, or other benefits to current or prospective students."  Ex. D. at 1.  The Justice Department also asked Harvard Law School to produce documents to "support this certification," including "any and all relevant documents guiding your admissions policies and procedures" and "all admissions data for the past five academic years, including applicant test scores (LSAT), GPA, extracurricular activities, essays, and admission outcomes, disaggregated by race and ethnicity."  *Id.*  The Department of Justice asked Harvard Law School to "send the requested information by May 2."  *Id.* at 2.

28.     The Department of Justice sent Harvard Medical School a similar letter on the same day.  The letter requested "any and all documents guiding medical school admissions and policies, including any documents related to the use or lack of use of race in evaluating applicants [and] all documents regarding any changes in policies or procedures following [*SFFA*]."  Ex. E at 2.  The

Department of Justice also asked Harvard Medical School to produce "all admissions data for the past five academic years, including applicant test scores (MCAT), GPA, extracurricular activities, essays, and admission outcomes, disaggregated by race and ethnicity." *Id.* The Department of Justice reminded Harvard that it "signed contractual assurances to permit the Department of Justice to examine records and access other sources of information and facilities." *Id.* at 1–2.

29. The Justice Department needs applicant-level data to determine whether Harvard is complying with Title VI and the Supreme Court's ruling in *SFFA*.

30. Harvard asked the Department of Justice to extend all of these deadlines to May 16, 2025. The Justice Department granted Harvard's request. Ex. F at 1.

31. On May 16, 2025, Harvard made its initial production of documents.

    a. Harvard produced 292 pages of documents concerning Harvard College. Most of these documents were publicly available, such as documents regarding Harvard College's admissions process, financial aid policies, and statistical information on its student body.

    b. Harvard produced 441 pages of documents concerning Harvard Law School. Most of these documents were publicly available, such as documents regarding Harvard Law School's admissions process and financial aid policies.

    c. Harvard produced 183 pages of documents concerning Harvard Medical School. Most of these documents were publicly available, such as documents regarding Harvard Medical School's admissions process and aggregated statistical information about the student body.

32.    Harvard failed to produce many of the documents requested by the Department of Justice.  Most notably, its May 16 production did not include applicant-level admissions data and documents.

33.    Harvard made its second production on May 30.

a.    Harvard produced 106 pages of documents concerning Harvard College, including guidelines for admissions personnel and aggregated admissions data for years 2022–2024.

b.    Harvard produced 686 pages of documents concerning Harvard Law School, including guidelines for admissions personnel and aggregated enrollment data for years 2022–2024.

c.    Harvard produced 595 pages of documents concerning Harvard Medical School, including guidelines and instructional material provided to its admissions personnel for years 2022–2025, aggregated admissions data for years 2022-2024 (not applicant-level)[7], and an internal memo concerning its admissions policy in light of *SFFA*.

34.    Like the May 16 production, the May 30 production did not include any of the requested applicant-level admissions data and documents.

35.    On September 8, 2025, the Department of Justice informed Harvard that its production of documents relating to Harvard Medical School was insufficient.  Specifically, although the Department of Justice requested "any and all documents guiding medical school admissions policies and procedures, including any documents related to the use or lack of use of race in evaluating applicants" and "all admissions data for the past five academic years," Harvard

---

[7] The aggregated admissions data includes demographic statistics of Harvard's admissions pools and incoming classes as a whole but does not include individual-level applicant data, such as each applicant's race, GPA, and MCAT score.

provided only "aggregated admissions data," not the requested "individual-level applicant data." Ex. G at 1–2.

36.    The September 8 letter provided considerable details about the applicant-level admissions data the Department of Justice seeks.  It included a request for a "searchable electronic spreadsheet" containing individual-level data such as applicants' race and ethnicity, economic indicators, undergraduate class rank and GPA, MCAT scores, internal ratings, and "Holistic Review" factors and ratings.  Ex. G at 3–5.  The Department of Justice also requested that Harvard provide documents relating to admissions policies for Harvard Medical School, including correspondence related to race; ethnicity; diversity, equity, and inclusion ("DEI"); and *SFFA*.  *Id.* at 6–7.  The Department of Justice warned Harvard that failure to provide responsive documents could result in an enforcement action.  *Id.* at 2.

37.    On September 12, 2025, the Department of Justice sent a similar letter explaining that Harvard failed to produce individualized admissions data for applicants to Harvard College. The letter provided considerable details about the applicant-level admissions data the Department of Justice seeks.  It included a request for a "searchable electronic spreadsheet" containing individual-level data such as applicants' race and ethnicity, racial and ethnic demography of their high schools and zip codes, grade point averages, recruited athlete status, employment history, financial aid offerings, interviewer ratings, and internal ratings.  Ex. H at 3–5.  The Department of Justice also requested that Harvard provide documents relating to admissions policies for Harvard College, including correspondence related to race, ethnicity, DEI, and *SFFA*.  *Id.* at 6–7. The Department of Justice again warned Harvard that failure to provide responsive documents could result in an enforcement action.  *Id.* at 2.

38.     The September 8 letter requested that Harvard produce responsive documents concerning Harvard Medical School by September 29.  Ex. G at 2.  The September 12 letter requested that Harvard produce responsive documents concerning Harvard College by October 6.  Ex. H at 2.

39.     After discussions with Harvard's counsel, the Department of Justice agreed to one final extension of the deadline for production of Harvard Medical School documents until October 10, even though the United States first requested the admissions data nearly six months earlier.  Ex. I at 1.  The Department of Justice stated that it would not "agree[] to any further extensions" and warned Harvard that failure to produce "all of the requested data by October 10th" would be viewed as a failure "to cooperate with the United States' compliance review."  *Id.*

40.     Harvard asked for an extension to October 17 to produce Harvard College data.  Ex. J at 1.  The Department of Justice agreed to extend the deadline for production of Harvard College documents to the same date as the Harvard Medical School deadline, October 10.  *Id.*

41.     Harvard did not produce the requested data by October 10, 2025.

42.     Harvard still has not produced any documents in response to the Department of Justice's September 8 and September 12 letters and has not provided any explanation for its failure to meet the October 10 (or October 17) deadlines.  Its most recent production on admissions practices was on May 30.

11

III.    **The Department of Education investigates Harvard**

A.    *Harvard's obligations as a recipient of financial assistance from the Department of Education*

43.    Harvard participates in several student financial assistance programs administered by the Department of Education, including the Federal Pell Grant Program and the Federal Work-Study Program.  Ex. K at 1.[8]

44.    When applying to participate in these programs in 2024, Harvard signed a "Program Participation Agreement" in which it agreed to "comply with … Title VI of the Civil Rights Act of 1964, as amended, and the implementing regulations, 34 C.F.R. Parts 100 and 101."  Ex. K at 2.  Part 100 includes the Department of Education's regulations implementing Title VI.

45.    The Program Participation Agreement is a legally binding contract between Harvard and the Department of Education.  It expires on June 30, 2030.

46.    The Department of Education's Title VI regulations, like those of the Department of Justice, require "[e]very application for Federal financial assistance" to "contain or be accompanied by an assurance that the program will be conducted … in compliance with all requirements imposed by or pursuant to this subpart [Part 100]."  34 C.F.R. § 100.4(a)(1).  The regulations further provide that "such assurance shall include provisions which give the United States a right to seek its judicial enforcement."  *Id.*

47.    Part 100 parrots Title VI and states, "No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this part applies."  34 C.F.R. § 100.3(a).

---

[8] https://seo.harvard.edu/for-students/federal-work-study; https://college.harvard.edu/financial-aid/federal-disclosures

48.     Part 100 contains additional prohibitions of "[s]pecific discriminatory actions." 34 C.F.R. § 100.3(b).  For example, recipients of federal funding may not discriminate "on the ground of race, color or national origin" in any of the following ways:

> (i) Deny an individual any service, financial aid, or other benefit provided under the program; (ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program; (iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any disposition, service, financial aid, or benefit under the program; (iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program; (v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership, or other requirement or condition which individuals must meet … [or] (vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program.

*Id.*

49.     Like the corresponding Department of Justice regulations, Part 100 requires recipients of federal funding to submit "timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the responsible Department official or his designee may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this part."  34 C.F.R. § 100.6(b).

50.     Part 100 requires recipients of federal funding to "permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities, as may be pertinent to ascertain compliance with this subpart."  34 C.F.R. § 100.6(b).

51.     Part 100 allows the Department of Education to "from time to time review the practices of recipients to determine whether they are complying with this part."  34 C.F.R. § 100.7(a).

52.     The Department of Education accordingly has the right to review Harvard's compliance with Title VI, and Harvard must permit the Department of Education to access "pertinent" information as part of its review.

B.     *Harvard fails to cooperate with the Department of Education's investigation of its admissions practices*

53.     In May 2025, the Department of Education opened an investigation of Harvard's compliance with Title VI.

54.     On May 2, 2025, the Department of Education sent Harvard a letter informing Harvard that it was "selected … for a compliance review under Title VI."  Ex. L at 1.  The letter explained that the Office for Civil Rights ("OCR") "will examine whether Harvard discriminates against applicants and potential applicants on the basis of race in its undergraduate admissions process."  *Id.*  The letter also noted that OCR "selects compliance review sites based on various sources of information, including statistical data and information from parents, advocacy groups, the media, and community organizations."  *Id.*

55.     The same day, the Department of Education sent Harvard eighteen interrogatories and seventeen document requests, many of which related to Harvard's consideration of race (if any) in undergraduate admissions.  For example, Interrogatory No. 6 asked Harvard to "[d]escribe any changes Harvard made to its policies, processes, or criteria for evaluating applications for undergraduate admissions in response to the Supreme Court's decision in *Students for Fair Admissions*," and Interrogatory No. 13 asked Harvard to "[d]escribe all race-neutral alternatives considered, implemented, or rejected for achieving student body diversity since … Students for Fair Admissions."  Ex. M at 2-3.

56.     As did the Department of Justice, the Department of Education requested applicant-level admissions data from Harvard.  Document Request No. 12 called for "[a]ll documents and

communications regarding admissions data disaggregated by race and ethnicity, including applicant test scores (SAT/ACT), GPA, extracurricular activities, essays, and admission outcomes." Ex. M at 6.  Document Request No. 13 called for "*individualized*, anonymized data for each applicant, admitted student, and enrolled student in spreadsheet format for each application season since January 1, 2016, including the following information:" "[t]he race of each student," "[e]ach student's standardized test scores," and "[e]ach student's GPA." *Id.*

57.     On June 17, 2025, Harvard made its initial production of documents.  Harvard produced 489 pages of documents, many of which were publicly available.  Harvard also provided a narrative response about its efforts to ensure compliance with *SFFA*.  Ex. N at 1.  The narrative response partially answered some, but not all, of the interrogatories issued by the Department of Education.

58.     Harvard failed to produce many of the documents requested by the Department of Education.  Most notably, its June 17 production did not include applicant-level admissions data or documents.

59.     On July 17, 2025, the Department of Education informed Harvard that its June 17 "responses were deficient or wholly unresponsive."  Ex. O at 1.  For example, Harvard did not provide any response to Interrogatory No. 13.  *Id.* at 4.  Nor did Harvard fully respond to Document Request No. 12.  *Id.* at 8.  It "did not provide either the applicant pool or admitted (i.e., whether ultimately enrolled or not) student numbers for the 2019-2024 admission cycles, including breakdowns by race, ethnicity, socioeconomic status,  geographic region, Pell Grant eligibility, first generation status, parental education levels, and FAFSA reported income bracket" or "any information for the admission cycles occurring from January 1, 2016, through 2018."  *Id.* at 4, 8.

Harvard also did not provide "any information relevant" to Documents Request No. 13. *Id.* at 9. The Department of Education requested that Harvard "provide the missing information." *Id.* at 8.

60.     Harvard did not provide all of the missing information. On July 31, 2025, Harvard made its second production of documents, which consisted of 32 pages of documents. Again, Harvard did not include applicant-level admissions data or documents. Harvard later asserted that it was not required to cooperate with the Department of Education's investigation because Harvard "was aware of no factual basis or evidence refuting that affirmation or Harvard's ongoing compliance with *SFFA*." Ex. P. at 3.

61.     On September 19, 2025, the Department of Education sent Harvard a letter entitled "Denial of Access." The letter reminded Harvard of its legal obligations to produce documents pursuant to 34 CFR Part 100 and summarized Harvard's document productions, narrative responses, and lack thereof. It announced OCR's determination that "Harvard has refused to provide the requested information necessary for OCR to make a compliance determination." Ex. Q at 2. The letter threatened that "[i]f Harvard does not voluntarily provide OCR with access to the requested information and materials **within 20 calendar days of this letter**, OCR will issue a Letter of Impending Enforcement Action to initiate the OCR's enforcement action process." *Id.* (emphasis in original).

62.     On March 23, 2026, the Department of Education sent Harvard a "Letter of Impending Enforcement Action." The letter repeated the "Denial of Access's" letter's factual findings and noted that "Harvard has not responded to OCR's Denial of Access Letter and has not provided the requested information necessary for OCR to make a compliance determination." Ex. R at 2. The letter informed Harvard that based on its "failure to provide access to the requested evidence, OCR will either (1) initiate administrative proceedings to suspend, terminate, or refuse

16

to grant or continue and defer financial assistance from funds made available through the Department to the recipient; or (2) refer the case to Department of Justice for judicial proceedings to enforce any rights of the United States under any law of the United States.  OCR will take this action **after 20 calendar days from the date of this letter** if access to the requested documentation and information is not fully provided." *Id.* at 3 (emphasis in original).

63.    On April 12, 2026, Harvard made its third production of documents, which consisted of 63 pages of documents.  This production *still* did not include the requested applicant-level admissions data.

64.    Harvard also sent the Department of Education a production letter raising objections to the document requests.  One of these objections referenced this lawsuit and characterized it as a "sprawling demand" that has a "notable overlap" with the Department of Education's requests.  Ex. S at 10-11.  According to Harvard, the Department of Education was "attempt[ing] to seek much of the very same information that is already subject to pending litigation." *Id.* at 12.

65.    The Department of Education accordingly referred this case to the Department of Justice on April 24, 2026, more than twenty days after it sent Harvard the Letter of Impending Enforcement Action.  Ex. T; *see also* 34 C.F.R. §§ 100.8(a).

**IV.    The United States investigates other universities' compliance with SFFA**

66.    Shortly after taking office, President Trump issued an executive order entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*.  EO 14173.  The order explains that "[l]ongstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin" and that "[h]ardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race.  *Id.* § 1.  Accordingly, "[i]t is the policy of the

United States to protect the civil rights of all Americans." *Id.* § 2.  The Executive Order instructs "all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities." *Id.*

67.    Before the Supreme Court's decision in *SFFA*, many elite universities considered race in their admissions processes.  Elite universities including Harvard, the other seven Ivy League universities, the California Institute of Technology, Carnegie Mellon University, Columbia University, Duke University, Emory University, Johns Hopkins University, the Massachusetts Institute of Technology, Stanford University, the University of Chicago, Vanderbilt University, and Washington University in St. Louis, publicly acknowledged that they considered race in their admissions processes.  Br. of Brown Univ., et. al as Amicus Curiae, *SFFA*, 600 U.S. 181 (2023), at 1.  Br. of Mass. Inst. of Tech., et. al as Amicus Curiae, *SFFA*, 600 U.S. 181 (2023), at 4, 6; Resp. Br. of President and Fellows of Harvard Coll., *SFFA*, 600 U.S. 181 (2023), at 49-54.

68.    Pursuant to Executive Order 14173 and its enforcement authority under Title VI, the Department of Justice is investigating admissions processes in more than eighty undergraduate programs, medical schools, and law schools across the country, including many of Harvard's peers. The purpose of each investigation is to assess "admissions policies and compliance with the Supreme Court's decision in *Students for Fair Admissions*." Ex. C at 1.  The Department of Education likewise is investigating the admissions programs at many elite universities.

69.    Nearly all of the elite universities under investigation have complied with Title VI and produced or pledged to produce applicant-level admissions data to the Department of Justice. For example, Brown University, Columbia University, Cornell University, Northwestern University, and the University of Virginia produced admissions data to the United States.

## FIRST CLAIM FOR RELIEF:
## TITLE VI

70.     The United States realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs.

71.     The Department of Justice's Title VI regulations, 28 C.F.R. Subpart C, require Harvard to make "timely, complete, and accurate compliance reports" to the Department of Justice and "permit access" to relevant documents.

72.     The Department of Education's Title VI regulations, 34 C.F.R. Part 100, require Harvard to make "timely, complete, and accurate compliance reports" to the Department of Education and "permit access" to relevant documents.

73.     Harvard is subject to Title VI because it has received, and continues to receive, federal financial assistance from the Department of Justice and the Department of Education for its programs and activities.

74.     Harvard has violated 28 C.F.R. Subpart C and 34 C.F.R. Part 100 because it has failed to make timely and complete document productions or otherwise permit the Department of Justice to access Harvard's applicant-level admissions data.

75.     The Department of Justice may use "any … means authorized by law" to secure Harvard's compliance with Title VI regulations, including 28 C.F.R. Subpart C and 34 C.F.R Part 100.  42 U.S.C. § 2000d-1.

76.     Federal law authorizes the Department of Justice to bring "[a]ppropriate proceedings … to enforce any rights of the United States under any law of the United States" as necessary to "induce compliance" with 28 C.F.R. Subpart C.  28 C.F.R. § 42.108(a).

77.      The Department of Justice has "advised [Harvard] of the failure to comply" with its obligations.  42 U.S.C. § 2000d-1.  It repeatedly has explained that Harvard's document

productions are insufficient, and it warned Harvard that failure to produce "all of the requested data by October 10th" would be viewed as a failure "to cooperate with the United States' compliance review."  Ex. I. at 1.  The Department of Education informed Harvard that it would "refer the case to Department of Justice for judicial proceedings" if it did not receive the requested documents within twenty days of its Letter of Impending Enforcement Action issued on March 23, 2026.  Ex. R at 3.

**SECOND CLAIM FOR RELIEF:**
**BREACH OF CONTRACT**

78.    The United States realleges and incorporates by reference the allegations set forth in all of the preceding paragraphs.

79.    The DOJ Grant and Program Participation Agreement are legally binding contracts between Harvard and the United States.

80.    Harvard agreed that, as required by 28 C.F.R. Subpart C and 34 C.F.R. Part 100, that it must make "timely, complete, and accurate compliance reports" to the Department of Justice and "permit access" to relevant documents.  Harvard further acknowledged that the Department of Justice and the Department of Education may "review [its] practices."  28 C.F.R. § 42.107(a); 34 C.F.R. § 100.7.

81.    Harvard's productions to the Department of Justice and the Department of Education were incomplete because they did not include applicant-level admissions data.  Harvard has not permitted the Department of Justice or the Department of Education to access applicant-level admissions data.

82.    The Department of Justice and the Department of Education made their initial requests for admissions data over one year ago.  The production deadlines have long passed, and Harvard has not remedied the deficiencies in its document productions.

83.    By failing to make timely and complete document productions or otherwise permit the Department of Justice and the Department of Education to access Harvard's applicant-level admissions data, Harvard has breached material terms in the DOJ Grant and the Program Participation Agreement.

## PRAYER FOR RELIEF

The United States respectfully requests that the Court:

1. Pursuant to 28 U.S.C. §§ 2201 and 2202, enter declaratory and injunctive relief as follows:

    a. Declare that Harvard has violated Title VI, its implementing regulations, and related contractual assurances by failing to provide the United States with access to documents, records, and other sources of information pertaining to the investigations of alleged race discrimination;

    b. Issue an injunction ordering Harvard's compliance with Title VI (including 28 C.F.R. Subpart C and 34 C.F.R. Part 100) and specific performance of the DOJ Grant and Program Participation Agreement, namely that Harvard provide the United States with access to the requested documents, records, and other sources of information;

    c. Issue an injunction directing Harvard to comply with all future document requests that the Department of Justice and Department of Education make pursuant to their authority under Title VI and 28 C.F.R. Subpart C or 34 C.F.R. Part 100.

2. Retain jurisdiction to review any disputes that may arise over compliance with the Court's order.

3. Grant the United States such other and further relief as the interests of justice may require.

DATED:  May 4, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

JEFFREY MORRISON (MO No. 44401)
Deputy Assistant Attorney General

 /s/   Joshua R. Zuckerman
RACHEL A. JANKOWSKI (DC No. 1686346)
BRIAN L. REPPER (DC No. 90028256)
Acting Deputy Chiefs
JOSHUA R. ZUCKERMAN (DC No. 1724555)
Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: joshua.zuckerman@usdoj.gov

22

**CERTIFICATE OF SERVICE**

I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will distribute copies of the foregoing to the following counsel of record for Defendant on this, the 4th day of May, 2026.

Helgi C. Walker
Stuart F. Delery
Eric R. Womack
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
T: (202) 887-3599
F: (202) 530-9595
hwalker@gibsondunn.com

Joshua S. Levy
ROPES & GRAY LLP
The Prudential Tower
800 Boylston Street
Boston, MA 02199
T: (617) 951-7000
F: (617) 951-7050
joshua.levy@ropesgray.com

Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com

Robert K. Hur
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
T: (202) 383-8969
F: (202) 626-3737
rhur@kslaw.com

/s/     *Joshua R. Zuckerman*
Joshua R. Zuckerman