# EXHIBIT S

# KING & SPALDING

King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
www.kslaw.com

Robert K. Hur
Partner
Direct Dial: +1 202 383 8969
rhur@kslaw.com

April 12, 2026

**FOIA CONFIDENTIAL TREATMENT REQUESTED**

**VIA E-MAIL AND FTP**

Sterling Thomas
Regional Director
United States Department of Education, Office for Civil Rights

Re:    **OCR Compliance Review 01-25-6001**

Dear Mr. Thomas:

I write on behalf of Harvard University ("Harvard" or the "University") in response to your March 23, 2026 "Letter of Impending Enforcement Action" (the "Letter"), which asserts that Harvard has "not provided the requested information necessary for [Office for Civil Rights ("OCR") of the U.S. Department of Education ("ED" or the "Department")] to make a compliance determination" of whether Harvard College "discriminates against applicants and potential applicants on the basis of race, color, and national origin."[1]  As the record of correspondence you cited in the Letter demonstrates, Harvard submitted two substantial and timely responses to ED OCR's requests, including a detailed eight-page narrative response and hundreds of pages of historical and current records relating to admissions practices.  To date, however, ED OCR has neither substantively responded to Harvard's repeated objections and concerns regarding the breadth, relevance, and purpose of ED OCR's sweeping requests, nor engaged with Harvard at all on the substance of its narrative and document responses.

In each response to ED OCR, Harvard made clear that it is committed to compliance with Title VI of the Civil Rights Act of 1964 ("Title VI") and all civil rights laws, provided and supplemented information responsive to ED OCR's requests, and posed in good faith concerns regarding the focus, scope, burden, and feasibility of ED OCR's 35 requests for information—many of which include subparts, resulting in more than 75 total substantive requests—reaching back nearly a decade.  Harvard hereby reiterates these concerns and questions, including regarding the pertinence of the information requested—some of which does not appear to connect at all to an inquiry regarding admissions (the subject specified in ED OCR's letter of May 2, 2025).  Clarity

---

[1] *See* Amended May 2, 2025 Notification Letter at 1.

April 12, 2026
Page 2

on these issues and the information the broad requests are intended to seek is necessary for Harvard to reasonably and meaningfully identify the information pertinent and appropriate to ED OCR's review.

## Factual Background

On May 2, 2025, ED OCR issued a notification letter and amended compliance information request ("May 2 Information Request")[2] to Harvard, stating that the Department was conducting a compliance review to determine whether Harvard "discriminates against applicants and potential applicants on the basis of race in its undergraduate admissions process." As Harvard has noted in prior correspondence, the May 2 Information Request was extraordinarily broad and sought a wide range of information about undergraduate admissions, financial aid, and race-based efforts, officials, and student groups going back nearly a decade to January 1, 2016—more than seven years before the Supreme Court's decision in *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*").

Harvard timely responded on June 17, 2025, by providing a submission and document production that described Harvard's compliance with Title VI and *SFFA*, including concrete steps Harvard has taken to implement the Supreme Court's decision. Despite the fact that Harvard's submission included information directly responsive to many of the interrogatories and document requests in the May 2 Information Request (including nearly 500 pages of documentation), on July 17, 2025, ED OCR sent a letter asserting that "most [of Harvard's prior] responses were deficient or wholly unresponsive" and requesting complete responses by July 31, 2025. On July 31, 2025, Harvard again timely sent a letter identifying objections and concerns about the true nature of the Department's requests and noting that the University had already provided information sufficient to demonstrate Harvard's compliance with Title VI and *SFFA*. Still, Harvard made a supplemental production that included additional information and materials responsive to ED OCR's requests.

For almost two months thereafter, there was no correspondence from ED OCR. Then, on September 19, 2025, without **any** prior notice, ED OCR sent to Harvard what it characterized as a "Denial of Access letter pursuant to Section 603 of OCR's Case Processing Manual (CPM)" ("September 19 Letter"). Among other things, the September 19 Letter stated that "Harvard has refused to provide the requested information necessary for OCR to make a compliance determination," and warned that if Harvard did not provide ED OCR with access to the requested information within 20 calendar days, ED OCR would issue a "Letter of Impending Enforcement Action" to initiate its enforcement action process, consistent with ED OCR's CPM. From October 1 to November 12, 2025, the federal government shut down until Congress passed appropriations

---

[2] ED OCR sent an initial Compliance Review Information Request at 5:44 p.m. ET on May 2, 2025, and followed up with a "Compliance Review Amended Information Request" at 8:05 p.m. ET on that same date, along with an e-mail stating that the "Compliance Review Amended Information Request completely supersedes the Compliance Information Request that was e-mailed to you at 5:50 p.m. today."

April 12, 2026
Page 3

legislation for the 2026 fiscal year, meaning that the Education Department was shut down during the period when it expected Harvard's response to its September 19 Letter.[3]

On March 23, 2026, more than six months later—and more than a month after the Department of Justice ("DOJ") separately filed suit against Harvard University seeking to compel the production of similar admissions-related data in a separate Title VI compliance investigation[4]—ED OCR sent a "Letter of Impending Enforcement Action" and demanded the production of all the data and materials requested in the May 2 Information Request. On that same date, ED OCR opened two new Title VI investigations into Harvard University, including an investigation into a complaint regarding Harvard College admissions that was submitted to ED OCR nearly a year prior to the initiation of the investigation.[5] Within days of these letters, ED issued a press release citing accomplishments in "ensuring admissions transparency," including that Harvard and other institutions were "returning to admission based on merit" and had seen "substantial shifts" in admissions for the class of 2029.[6]

### Harvard's Objections

**ED OCR has failed to follow OCR's own Case Processing Manual**. In threatening to initiate administrative proceedings to terminate Harvard's funding or refer this matter to DOJ, ED OCR has departed from procedures required in its CPM. First, per the CPM, a recipient "denies access to OCR" only when it refuses to permit access to "information maintained by the recipient that is *necessary to determine compliance status* of the . . . issue(s) under investigation." CPM § 603 (emphasis added). As explained below, much of the information sought is not pertinent to Harvard's Title VI compliance, let alone *necessary* to determine it. Indeed, as noted above, with the information it already has received, the Department expressed its view in a press release issued just last month that Harvard was "returning to admission based on merit" and acknowledges that Harvard "ha[s] seen substantial shifts in their admissions for the class of 2029," consistent with compliance with *SFFA*.[7] Second, OCR is required by the CPM to "attempt to ascertain the exact

---

[3] During the government shutdown, via correspondence with DOJ regarding litigation in which ED is a defendant, Harvard confirmed the government's position that the shutdown resulted in a lapse of appropriations that paused ED OCR's investigative activity, and the government committed to notify Harvard when appropriations were restored and Harvard should reengage regarding agency requests and investigations.

[4] *See* Complaint for Declaratory and Injunctive Relief, *United States v. Pres. and Fellows of Harvard Coll.*, 1:26-cv-10844-MJJ, ECF 1 (D. Mass. Feb. 13, 2026).

[5] *See* Press Release, U.S. Dep't of Educ., U.S. Department of Education's Office for Civil Rights Opens Two New Probes into Harvard University for Continued Discrimination on Campus (Mar. 23, 2026), https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-opens-two-new-probes-harvard-university-continued-discrimination-campus, (describing investigations into college admissions and alleged antisemitism on Harvard's campus).

[6] *See* Press Release, U.S. Dep't of Educ., Victories for Higher Education: Raising Academic Standards and Ensuring Admissions Transparency (Mar. 27, 2026), https://www.ed.gov/about/news/press-release/victories-higher-education-raising-academic-standards-and-ensuring-admissions-transparency.

[7] *Id*.

April 12, 2026
Page 4

basis for the recipient's refusal and *explain OCR's authority to obtain the evidence*."  CPM § 603 (emphasis added).  OCR has made no such efforts to engage with Harvard's concerns and has not responded to Harvard's arguments that it lacks the authority to obtain the information it claims is missing from Harvard's responses, nor why that information is necessary to determine Title VI compliance.  Third, neither of ED OCR's letters of September 19, 2025 or March 23, 2026 "sets forth in detail the evidence (e.g., documents, data, other information, witnesses) to which the recipient denied OCR access and specifies the efforts that OCR has made to obtain the evidence" as required by the CPM. *Id*.

**ED OCR is obligated to pursue informal resolution and voluntary compliance.**  Even if ED OCR perceives there has been non-compliance, the regulations—as required by statute—demonstrate a strong preference for informal resolution.  *See* 42 U.S.C. § 2000d-1 (authorizing adoption of rules and procedures to enforce Title VI provided that "no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has *determined that compliance cannot be secured by voluntary means*") (emphasis added); *accord* 34 C.F.R. §§ 100.6(a), 107(d)(1), 108(d); *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, 788 F. Supp. 3d 70, 76 (D. Mass. 2025).  In fact, ED OCR itself is required by statute to "help [funding recipients] comply voluntarily with civil rights laws in order to prevent [] violations from even occurring in the first place." *Victim Rts. L. Ctr.*, 788 F. Supp. 3d at 76–77.  ED OCR's warning in its September 19 Letter that it would soon initiate enforcement action is inconsistent with ED OCR's obligations, given the lack of any effort ED OCR has made to date to engage with Harvard to seek voluntary compliance, to the extent it deems that Harvard is not in compliance (which Harvard disputes).

**ED OCR's requests are overbroad, unduly burdensome, and unnecessary to determine Title VI compliance, and were issued for improper purposes.**  Harvard reiterates that it objects to ED OCR's outstanding information requests on the grounds that they are overbroad, unduly burdensome, and unnecessary to determine Harvard's compliance with Title VI.  Under Title VI and its implementing regulations at 34 C.F.R. § 100 *et seq.*, ED OCR has the authority to conduct periodic compliance reviews of federal funding recipients to "determine whether they are complying" with Title VI, and, if not, to work with the institution informally to achieve voluntary compliance.  Pursuant to this authority, ED OCR may require the recipient to "permit access . . . to such of its books, records, accounts, and other sources of information, and its facilities **as may be pertinent to ascertain compliance** with [Title VI and its implementing regulations.]"  34 C.F.R. § 100.6(c) (emphasis added).

Although "[t]he compliance review regulations afford OCR broad discretion to determine the substantive issues for investigation," CPM at 21, they do not contemplate fishing expeditions.  Both the CPM itself and legal authorities impose relevance and burden limitations on what ED OCR may request to ascertain compliance with Title VI.  In particular, the CPM explains that ED OCR's data requests "must be reasonable and take into consideration the burden placed on the recipient," including "paperwork burdens when requesting a recipient to do more than provide OCR access to normally maintained information" or to "manipulate or compile information." CPM § 702(c)(3).  Courts have also held that administrative agency information requests must be reasonably relevant.  *See CFPB v. Accrediting Council for Indep. Colleges & Sch.*, 854 F.3d 683, 688 (D.C. Cir. 2017) (inquiry must be "[(1)] within the authority of the agency," "[(2)] not too

April 12, 2026
Page 5

indefinite," and "[(3)] reasonably relevant"). Moreover, agency demands for information must be issued for a proper purpose. *Cf. Bd. of Govs. of the Fed. Res. Sys. v. United States*, No. MC 26-12 (JEB), 2026 WL 710202, at *8–10 (D.D.C. Mar. 13, 2026) (quashing grand jury subpoena issued for an "improper purpose"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229 (D. Mass. 2025) (quashing administrative subpoena issued for an improper purpose). As explained below, ED OCR's demands are not targeted to determining Harvard's compliance with Title VI but instead appear designed to harass, coerce, and retaliate against the University.

**ED OCR's requests are not pertinent to ascertaining Title VI compliance.** ED OCR's outstanding information requests, on which it bases its denial of access, are not pertinent to ascertain Harvard's compliance with Title VI. To start with, those requests are wildly overbroad given the nearly ten-year period they cover. For example, Interrogatories 1–3, 12, 14, and 17–18 and Document Requests 4, 6, 7, 9, 11, 13–15, and 17 all seek information dating back to January 1, 2016. ED OCR has yet to provide a reasonable basis for seeking information dating back more than seven years before the *SFFA* decision. As we have noted previously, ED OCR's authority is limited to ascertaining and achieving *current* compliance with Title VI. *See* 34 C.F.R. § 100.7(a)–(c) (giving ED OCR authority to conduct reviews of federal funding recipients to "determine whether they are complying with [Title VI]"); *id.* § 100.8(c) & (d) (allowing enforcement only if there has been a determination that "compliance cannot be secured by voluntary means"); 42 U.S.C. § 2000d-1.

Providing records and information over that lengthy period would be unduly burdensome to Harvard, and, more importantly, would not provide ED OCR with relevant information about Harvard's *current* compliance with Title VI. The Supreme Court's 2023 decision in *SFFA* provided new guidance to universities, as demonstrated by the fact that ED OCR deemed it necessary to issue compliance guidance after the decision,[8] and as Harvard has explained in its prior responses, the University changed its policies and practices to comply with the *SFFA* decision, including conducting mandatory training for admissions reviewers and updating admissions reading procedures and interviewing guidelines for alumni interviewers, to reinforce that race, ethnicity, and national origin cannot be taken into account in the admissions process. Amongst other items, Harvard removed access to race or ethnicity "check box" data, revised training materials, instructed reviewers and admissions staff how an applicant's or recommender's mention of an applicant's race in an application should be handled, directed alumni interviewers not to take an applicant's race or identity into account, and prohibited the calculation of any race/ethnicity data until after the close of admissions processes, including any waitlist decisions. Following the Supreme Court's ruling in *SFFA* and remand to the district court, Harvard and plaintiff Students for Fair Admissions, Inc. ("SFFA") conferred regarding compliance with the Court's opinion and the appropriate remedy, including the measures described above. SFFA was

---

[8] *See* U.S. Dep't of Just. C.R. Div. & U.S. Dep't of Educ. Off. for C.R., Dear Colleague Letter on *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.* (Aug. 14, 2023), https://www.ed.gov/media/document/colleague-20230814pdf-35094..pdf; *see also* U.S. Dep't of Just. C.R. Div. & U.S. Dep't of Educ. Off. for C.R., Questions and Answers Regarding the Supreme Court's Decision in *Students for Fair Admissions, Inc. v. Harvard Coll. and Univ. of North Carolina* (Aug. 14, 2023).

April 12, 2026
Page 6

satisfied with Harvard's actions, commitments, and implementation, and the parties filed a Joint Motion for Entry of Final Judgment,[9] which the district court granted.[10]

Harvard's admissions practices and admissions data for the years prior to the *SFFA* decision have no bearing on Harvard's present compliance. At most, ED OCR would need only information sufficient to show that Harvard changed its practices following the *SFFA* decision, which Harvard has provided. *See Saunders v. White*, 191 F. Supp. 2d 95, 130 (D.D.C. 2002) (data from prior years "do[] not indicate whether there was discrimination against black officers in the Army from 1983 until 1993, when the policy at issue in this case went into effect").

Information from as far back as 2016 is also not pertinent to Title VI compliance because it falls far outside the applicable statute of limitations should ED OCR bring a Title VI claim against Harvard. The statute of limitations for a Title VI claim, like for Section 1981 or Section 1983 claims, is "analogous to a state claim for personal injuries." *Monroe v. Columbia Coll. Chicago*, 990 F.3d 1098, 1100 (7th Cir. 2021). In Massachusetts, that period is three years. *Alston v. Town of Brookline*, 308 F. Supp. 3d 509, 553 (D. Mass. 2018). Information from prior to 2023 thus not only predates the Supreme Court's new guidance for universities in *SFFA* but also falls far outside the statute of limitations for Title VI. As would be the case if ED OCR sought this information in litigation, the statute of limitations is instructive in determining whether the information, documents, and data sought are pertinent to Title VI compliance. *See Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 22 (1st Cir. 2010) (imposing limitations on use of time-barred evidence in discrimination claim).

Furthermore, even setting aside the date range, the substance of many of ED OCR's requests is untethered to its stated purpose of determining whether Harvard "discriminates against applicants and potential applicants on the basis of race in its undergraduate admissions process."

Specifically, a number of ED OCR's requests seek information, data, or documents that have no bearing on the question that ED OCR purports to investigate. Because ED OCR is reviewing Harvard's admissions process, its requests "must therefore be targeted to determine if [applicants were] treated unequally in the admissions process." *Students for Fair Admissions, Inc. v. Univ. of N. Carolina*, 2017 WL 11684866, at *5 (M.D.N.C. Aug. 9, 2017). Many of ED OCR's requests are insufficiently targeted and range from overbroad to plainly irrelevant. For example:

- Interrogatories 16–18 relate to Harvard's "offices, officials, practices, policies, initiatives, clubs, programs, events, orientations, trainings, awards, ceremonies, grants, contracts, scholarships, graduation requirements, housing, counseling, mentoring, and internships" that include in their descriptions terms such as "DEI," "multicultural," "belonging," "advocacy," and "empowerment," among a non-exhaustive list of 28 possible terms. Such opportunities for Harvard's *enrolled* students have no bearing whatsoever on whether Harvard considers race in *admissions*. These requests are

---

[9] Joint Motion for Entry of Final Judgment, *Students for Fair Admissions, Inc.* v. *Pres. and Fellows of Harvard Coll.*, No. 1:14-cv-14176-ADB, ECF 752 (D. Mass. Jan. 8, 2024).

[10] Final Judgment, *Students for Fair Admissions, Inc.* v. *Pres. and Fellows of Harvard Coll.*, No. 1:14-cv-14176-ADB, ECF 754 (D. Mass. Jan. 8, 2024), previously produced at HRVD-EDOCR-0061-000000381.

April 12, 2026
Page 7

therefore overbroad and plainly not pertinent to the subject of ED OCR's review. Further, in seeking information on programs that use words and phrases (that have no bearing on admissions discrimination) with which ED OCR apparently takes issue, ED OCR is encroaching on the First Amendment-protected speech of Harvard and its faculty, staff, and students. *See* CPM § 109 ("all actions taken by OCR must comport with First Amendment principles").

- Document Request 15 seeks, in part, demographic surveys sent to faculty. Demographic data on Harvard's faculty have no relation to whether Harvard discriminates against applicants.

- Document Request 17 seeks complaints related to antisemitism, which is not the subject of ED OCR's review.

**Pretextual and unconstitutional retaliation against Harvard.** Indeed, and as noted in Harvard's prior correspondence with ED OCR, the overbroad and burdensome nature of ED OCR's requests, now paired with its recognition of the substantial demographic shifts in Harvard's undergraduate admissions, strongly suggests that the Department's compliance review—ostensibly focused on Harvard's compliance with Title VI—is simply another front in the federal government's wide-ranging campaign to retaliate and punish Harvard for exercising its First Amendment rights in rejecting the government's efforts to control its speech, governance, and institutional values. On April 14, 2025, Harvard rejected the government's detailed list of conditions to "maintain Harvard's financial relationship with the federal government," which included:

- "commission[ing] an external party" satisfactory to the government to "audit the student body, faculty, staff, and leadership for viewpoint diversity, such that each department, field, or teaching unit must be individually viewpoint diverse";

- for departments, fields, and teaching units found to "lack viewpoint diversity," "hiring a critical mass of new faculty" and "admitting a critical mass of students" to provide the government's preferred balance of viewpoint diversity;

- "reform[ing] and restructuring" governance; and

- "shutter[ing]" all DEI programs "through structural and personnel changes."[11]

The government's retaliation in response to Harvard's rejection of those demands was swift and wholesale. Within hours, the government froze $2.2 billion in multi-year grants and $60 million in multi-year contract value to Harvard, citing "the troubling entitlement mindset that is

---

[11] Letter from Josh Gruenbaum, Comm'r, Gen. Servs. Admin., et al., to Dr. Alan M. Garber, President, Harvard Univ., et al. (Apr. 11, 2025), https://www.harvard.edu/research-funding/wp-content/uploads/sites/16/2025/04/Letter-Sent-to-Harvard-2025-04-11.pdf [hereinafter Gruenbaum Letter].

April 12, 2026
Page 8

endemic in our nation's most prestigious universities and colleges."[12]  Harvard filed suit on April 21, 2025, challenging the government's freeze of federal research funds as a violation of the First Amendment, a circumvention of the procedures and limits in Title VI, and arbitrary and capricious under the Administrative Procedure Act.[13]  In September 2025, the federal district court held that the funding freeze was illegal.  In the opinion announcing the decision, the court observed that the government's "swift and sudden decision to terminate funding, ostensibly motivated by antisemitism, was made before they learned anything about antisemitism on campus or what was being done in response, [leading] the Court to conclude that the sudden focus on antisemitism was, at best … arbitrary and, at worst, pretextual."  *Pres. & Fellows of Harvard Coll.*, No. 25-CV-10910-ADB, 2025 WL 2528380, at *25 (D. Mass. Sept. 3, 2025).

The government also responded to Harvard's rejection of its demands by launching unfounded investigations and other punitive actions from multiple federal agencies, including the Departments of Justice, Health and Human Services, Homeland Security, Education, Commerce, Defense, State, and the Equal Employment Opportunity Commission related to Harvard's academic and administrative practices.  Furthermore, public statements from President Trump, Secretary McMahon, and others have illustrated the retaliatory nature of the actions taken by the federal government and this Department.  For example, President Trump threatened Harvard's "Tax Exempt Status" and made clear that the revocation would be purely retaliatory.  On social media, he stated Harvard should "be Taxed as a Political Entity if it keeps pushing political, ideological, and terrorist inspired/supporting 'Sickness[].'"[14]  On May 5, 2025, Secretary McMahon, purporting to speak on behalf of every agency and department, announced that "Harvard will cease to be a publicly funded institution," and in the days that followed, Harvard began to receive institution-wide termination notices from various agencies.[15]  At a press conference on May 28, 2025—after the White House reportedly convened a meeting of top government officials from nearly a dozen agencies to discuss additional punitive measures to target Harvard—the President again made clear that his Administration was retaliating against Harvard for its exercise of its legal rights: "every time [Harvard] fights, they lose another $250 million."[16]

---

[12] Press Release, U.S. Dep't of Ed., Joint Task Force to Combat Anti-Semitism Statement Regarding Harvard University (Apr. 14, 2025), https://www.ed.gov/about/news/press-release/joint-task-force-combat-anti-semitism-statement-regarding-harvard-university.

[13] Complaint for Declaratory and Injunctive Relief, *Pres. and Fellows of Harvard Coll. v. U.S. Dep't of Health and Human Servs. et al.*, 1:25-cv-11048-ADB, ECF 1 (D. Mass. Apr. 21, 2025).

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 15, 2025), https://truthsocial.com/@realDonaldTrump/posts/114342374504628520.

[15] *See* First Amended Complaint for Declaratory and Injunctive Relief ¶¶ 7–8, *Pres. and Fellows of Harvard Coll. v. U.S. Dep't. of Health and Human Servs. et al.*, 1:25-cv-11048-ADB, ECF 59 (D. Mass. May 13, 2025).

[16] *President Donald Trump Taking Questions in the Oval Office at 6:05* (Newsmax broadcast May 28, 2025, 12:42 PM ET), https://perma.cc/ZUC6-3SP6.  Relatedly, Commerce Secretary Howard Lutnick has also characterized various agency efforts against Harvard as a coordinated retaliatory effort, stating at an August 2025 Cabinet meeting, "[W]e just have a blast, you know?  Because [Secretary McMahon is] hitting Harvard, and she says, 'What can we do?'  Now we send them a

April 12, 2026
Page 9

Similarly, Secretary McMahon has confirmed the government's retaliatory approach, explaining that Harvard has "taken a very hard line, so we took a hard line back."[17]  Furthermore, on September 19, 2025—the same day that ED OCR sent its "Denial of Access" letter—the Department sent a separate letter to the University stating that the Department had determined there may be "a significant adverse effect on the financial condition of Harvard University" and placing the university on a "Heightened Cash Monitoring" method of payment, requiring the University to "submit financial protection by providing an irrevocable letter of credit . . . for $36,142,301" in order to remain eligible to receive federal student aid funds.[18]

In his public statements, President Trump continues to attack Harvard in terms that demonstrate his view that Harvard should be subject to punitive retribution.  For example, in a February 3, 2026 Truth Social post, less than one day after public media reported on negotiations about a resolution between Harvard and the Trump Administration,[19] President Trump accused Harvard of "serious and heinous illegalities" without providing support for the assertion, suggested that the University should be subject to criminal investigation, and then stated that "we will now be seeking One Billion Dollars in damages, and want nothing further to do, into the Future, with Harvard University."[20]  These public statements from the President suggest that ED OCR's renewed focus on its compliance review is motivated more by retaliatory animus against Harvard than an objective effort to ascertain the facts and assure compliance with Title VI.

In the weeks that followed the President's public statement, the government launched a number of new actions against Harvard.  On February 13, 2026, as noted above, DOJ filed suit against Harvard University seeking to compel the production of admissions-related data similar to data requested by ED OCR.[21]  On March 20, 2026, DOJ filed a separate suit against Harvard alleging race and national origin discrimination against Jewish and Israeli students, in violation of Title VI.[22]  In public statements about the two lawsuits, Assistant Attorney General ("AAG") for the Civil Rights Division Harmeet Dhillon acknowledged that DOJ's efforts were intended to single Harvard out, noting that DOJ "threw in the towel" and sued Harvard because Harvard was

---

patent letter and hit them again.  So we're having fun together."  CNN.com, Judge says Trump administration unlawfully blocked $2 billion from Harvard (Sept. 3, 2025), https://www.cnn.com/2025/09/03/politics/harvard-trump-first-amendment-funding-cuts.

[17] CNBC Television, *Education Secretary Linda McMahon to Harvard: Obey the law and you can be eligible for funding*, YouTube, at 1:04–31 (May 7, 2025), https://www.youtube.com/watch?v=bb6YJUHMqc4.

[18] Letter from Rhonda C. Shaffer, Acting Executive Director, IHE Oversight and Enforcement, to Dr. Alan M. Garber, President, Harvard Univ. (Sept. 19, 2025).

[19] Michael C. Bender et al., *Trump Is Said to Have Dropped Demand for Cash From Harvard*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-harvard-payment.html?searchResultPosition=2.

[20] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 3, 2026), https://truthsocial.com/@realDonaldTrump/posts/116004776659519984.

[21] *See* Complaint for Declaratory and Injunctive Relief, *United States v. Pres. and Fellows of Harvard Coll.*, 1:26-cv-10844-MJJ, ECF 1 (D. Mass. Feb. 13, 2026).

[22] *See* Complaint for Declaratory and Injunctive Relief, *United States v. Pres. and Fellows of Harvard Coll.*, 1:26-cv-11352-RGS, ECF 1 (D. Mass. Mar. 20, 2026).

April 12, 2026
Page 10

"not serious about settling with the United States."[23]  AAG Dhillon has since explained that DOJ is singling out Harvard to get its "bang for the buck" because Harvard is "disproportionately influential and global" and because Harvard "sued" and "is defiant."[24]

Further, on March 23, 2026—the same day it sent the Letter of Impending Enforcement Action—ED OCR announced that it was opening two new investigations into Harvard concerning alleged violation of *SFFA* and alleged antisemitic discrimination on campus.  These investigations represent the government's latest retaliatory actions against Harvard.

**Admissions-related data are at issue in two pending lawsuits.**  Sent more than six months after its last contact with Harvard, ED OCR's Letter of Impending Enforcement Action demands the production of admissions data that are already at issue in two federal lawsuits.  As just noted above, DOJ (the federal agency tasked with coordinating the implementation and enforcement of Title VI[25]) filed a lawsuit in February 2026 seeking to compel Harvard's production of individual applicant-level admissions data, including for undergraduate admissions, as well as an expansive array of documents and correspondence, for the stated purpose of "determin[ing] whether Harvard continues to unlawfully discriminate against applicants for admissions on the ground of race."[26]  DOJ seeks to compel Harvard's production of individual-level application, admission, and enrollment data for all undergraduate applicants from the 2018–19 cycle through the 2024–25 cycle and specifically calls for 51 data points regarding each individual applicant.[27]  Its sprawling demand—which Harvard is contesting in court—calls for a comprehensive set of data for every single applicant over seven admissions cycles.  The data include applicant demographic information, including race and ethnicity and first-generation college status; information regarding economic indicators, including financial need assessment, family income brackets, and Pell grant status; standardized test scores; weighted and unweighted high school GPA; the admissions decision for each applicant; student application essays and essay ratings; the enrollment decision for each admitted student; and financial aid offered to each admitted student.[28]  The individual-level data at issue in the DOJ suit therefore sweeps in *nearly every single data point* for individual applicants that ED OCR requests in its review.[29]  DOJ's expansive demands for documents and correspondence from 2018 to present similarly have

---

[23] *Harmeet Dhillon: Harvard continues to discriminate against whites*, Newsmax (Feb. 25, 2026), https://www.youtube.com/watch?v=QmvoRJBC5bU.

[24] Tunku Varadarajan, *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*, Wall Street Journal (Mar. 27, 2026), https://tinyurl.com/3r9uayx6.

[25] Executive Order 12250 (Nov. 2, 1980) (assigning the Attorney General responsibility to "coordinate the implementation and enforcement by Executive agencies" of Title VI, including by establishing guidelines "for the sharing and exchange by agencies of compliance records, findings, and supporting documentation").

[26] *See* Complaint for Declaratory and Injunctive Relief, *United States v. Pres. and Fellows of Harvard Coll.*, 1:26-cv-10844-MJJ, ECF 1 (D. Mass. Feb. 13, 2026).

[27] *Id.*

[28] *Id.*

[29] *Compare* Complaint for Declaratory and Injunctive Relief, at 4–6, *United States v. Pres. and Fellows of Harvard Coll.*, 1:26-cv-10844-MJJ, ECF 1 (D. Mass. Feb. 13, 2026), *with* ED OCR Compliance Review Information Request, Request 13 (May 2, 2025).

April 12, 2026
Page 11

notable overlap with ED OCR's requests. For example, DOJ demands documents referring or relating to how each data point requested was used to make the admissions decision for each applicant; all documents referring or relating to admissions practices; "[a]ll internal correspondence referring or relating to the use of race/ethnicity in admissions to Harvard College, and/or the *SFFA* Supreme Court Decision"; and "[a]ll internal correspondence referring or relating to admissions policy changes in response to the *SFFA* Decision."[30]

ED OCR's demand that Harvard produce additional data and documents or be subject to an enforcement action, which could include referral to DOJ for enforcement (*see* 34 C.F.R. § 100.8(a)), is an attempt to seek much of the very same information that is already subject to pending litigation between the United States and Harvard. Perhaps more importantly than the substantive overlap, both DOJ and ED OCR purport to be investigating the same allegation—i.e., the possibility that Harvard discriminates on the basis of race in its undergraduate admissions process. This runs counter to the CPM's explicit recognition that ED OCR has discretion to dismiss allegations or a complaint in its entirety when "[t]he same or a similar allegation based on the same operative facts" has been filed with another federal agency and "OCR anticipates that all allegations will be investigated and that there will be a comparable resolution process" to ED OCR or "[t]he same or a similar allegation based on the same operative facts has been filed either by the complainant or someone other than the complainant against the same recipient with state or federal court." CPM § 108(h)(i), (i).

Additionally, in March 2026, seventeen state Attorneys General filed suit challenging the Department's implementation of the Admissions and Consumer Transparency Supplement ("ACTS") survey through the Integrated Postsecondary Education Data System ("IPEDS"), which would require universities and other institutions of higher education to provide substantial admissions data, disaggregated by race and sex, from the 2025–26 academic year and six prior years.[31] Although its legal authority to do so has been challenged, the Administration has contended that the ACTS survey is intended to assess compliance with federal antidiscrimination law. On August 7, 2025, President Trump issued a memorandum tying the "persistent lack of available data" to "whether race is actually used in practice" in higher education admissions.[32] On the same date as the memorandum, Secretary McMahon directed the National Center for Education Statistics ("NCES") to make changes to collect "data disaggregated by race and sex relating to the applicant pool, admitted cohort, and enrolled cohort" of undergraduate students and to require reporting of "quantitative measures of applicants and admitted students' academic achievement such as standardized test scores, GPAs, first-generation college student status, and other applicant

---

[30] *See* Complaint for Declaratory and Injunctive Relief, at 6–7, *United States v. Pres. and Fellows of Harvard Coll.*, 1:26-cv-10844-MJJ, ECF 1 (D. Mass. Feb. 13, 2026).

[31] *See* Complaint for Declaratory and Injunctive Relief, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*, Case No. 1:26-cv-11229-FDS, ECF 1 (D. Mass. Mar. 11, 2026).

[32] Donald J. Trump, President, *Ensuring Transparency in Higher Education Admissions*, Presidential Memoranda (Aug. 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/08/ensuring-transparency-in-higher-education-admissions/.

April 12, 2026
Page 12

characteristics, for each race-and-sex pair."[33]  ED's Notice describing the new data submission requirements similarly focused on the need for the data to assess Title VI compliance: "The federal government does not currently collect racial data on admissions and scholarships and has limited tools to ensure widescale compliance with Title VI.  Greater transparency through the collection of this type of information will help to expose unlawful practices, enable the Department to better enforece [sic] Title VI, and create good incentives for voluntary compliance."[34]  The Notice further stated that "[t]he data to be collected from this effort will capture information that could indicate whether institutions of higher education are using race-based preferencing in their admissions processes."[35]  As a result, ACTS, through IPEDS, is now intended to serve as a method for assessing compliance with Title VI.  The plaintiff States and intervenors dispute that this is a proper purpose, and that issue has not yet been resolved.  But regardless, it is notable that, unlike ED OCR's May 2 Information Request, the new IPEDS requirements do not mandate the submission of *individualized* admissions data nor the submission of data prior to the 2020–21 academic year— confirming that—from the Education Department's perspective—such individualized data are not necessary to determine compliance with Title VI.[36]

In any event, submission of data in response to the new IPEDS requirements is currently paused for Harvard, and all members of the Association of American Universities ("AAU") and Association of Independent Colleges and Universities in Massachusetts ("AICUM") through April 14, 2026.[37]  AAU and AICUM, both of which include Harvard as a member, filed motions to intervene in the ongoing litigation regarding the ACTS survey as well as motions for a temporary restraining order to stay the implementation of the ACTS, including the deadline to complete the ACTS survey, on behalf of member institutions.[38]  On March 31, 2026, the district court granted

---

[33] Secretary McMahon's memorandum directing the changes further states that "[t]he collection and reporting of data on race/ethnicity and sex for students is mandatory for all institutions that receive, are applicants for, or expect to be applicants for Federal financial assistance as defined in the Department's regulations implementing Title VI of the Civil Rights … [y]et, the current survey neglects to collect important information that could reveal whether universities are discriminating against applicants based on race."  Linda McMahon, Sec'y of Educ., Memorandum to the Acting Dir., Inst. of Educ. Scis. & Acting Comm'r, Nat'l Ctr. for Educ. Stat., *Ensuring Transparency in Higher Education Admissions* (Aug. 7, 2025), https://www.ed.gov/media/document/secretary-directive-ensuring-transparency-higher-education-admissions-august-7-2025-110497.pdf.

[34] Notice, 90 Fed. Reg. 39384, 39385 (Aug. 15, 2025).

[35] *Id.*

[36] *Id.* at 39386.

[37] Temporary Restraining Order Further Extending Deadline, *Commonwealth of Massachusetts, et al. v. U.S. Department of Education, et al.*, Case No. 1:26-cv-11229-FDS, ECF 75 (D. Mass. Mar. 24, 2026).

[38] *See* Association of American Universities' Motion to Intervene, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*, Case No. 1:26-cv-11229-FDS, ECF 83 (D. Mass. Mar. 25, 2026); Association of American Universities' Motion for a Temporary Restraining Order, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*, Case No. 1:26-cv-11229-FDS, ECF 85 (D. Mass Mar. 25, 2026); Association of Independent Colleges and Universities in Massachusetts' Motion to Intervene, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*,

April 12, 2026
Page 13

AAU and AICUM's motions to intervene for the limited purpose of considering their respective motions for a temporary restraining order and issued a temporary restraining order extending the deadline to complete the ACTS survey for AAU, AICUM, and their member institutions through April 14, 2026.[39]  On April 3, 2026, the district court granted a preliminary injunction enjoining the Department from enforcing against the 17 plaintiff states and their state institutions of higher education any deadline for compliance with the ACTS survey until further order of the court or a trial on the merits. AAU and AICUM's motions for a temporary restraining order beyond April 14 remain pending as of the date of this letter).[40] A hearing is set for April 13, 2026.

In the midst of this litigation over the ACTS, ED OCR now attempts another "end run" to obtain admissions data purportedly to assess compliance with Title VI.  The ACTS survey requires seven years of admissions data, including race/ethnicity, standardized test scores, unweighted secondary school GPA, and family income; the ACTS survey also requires six years of data for enrolled students, including Pell Grant eligibility, parental college attainment, and financial aid status.[41]  The ACTS survey thus overlaps substantially with ED OCR's requests for aggregated data.[42]

ED OCR's renewed attempt to obtain this substantial applicant-level and disaggregated admissions data—the production of which is already the subject of two pending federal lawsuits, one initiated by the government itself—is inappropriate and suggests that the government may be attempting an "end run" to obtain sensitive and voluminous admissions data outside the litigation process.

\*        \*        \*

Despite these objections and concerns about the true nature of the Department's requests, Harvard is committed to demonstrating its compliance with Title VI and all civil rights laws and will supplement its July 31, 2025 response with additional information and materials responsive to ED OCR's requests, including information regarding admissions data.

---

Case No. 1:26-cv-11229-FDS, ECF 109 (D. Mass. Mar. 30, 2026); Association of Independent Colleges and Universities in Massachusetts' Motion for a Temporary Restraining Order, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*, Case No. 1:26-cv-11229-FDS, ECF 111 (D. Mass Mar. 30, 2026).

[39] Temporary Restraining Order Further Extending Deadline, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*, Case No. 1:26-cv-11229-FDS, 75 (D. Mass. Mar. 24, 2026).

[40] Preliminary Injunction, *Commonwealth of Mass., et al. v. U.S. Dep't of Educ., et al.*, Case No. 1:26-cv-11229-FDS, ECF 143 (D. Mass. Apr. 3, 2026).

[41] IPEDS 2025–2026 Data Collection System, Admissions and Consumer Transparency Supplement, https://surveys.nces.ed.gov/ipeds/public/surveymaterials/instructions?instructionid=30156.

[42] *Compare* IPEDS 2025–2026 Data Collection System, Admissions and Consumer Transparency Supplement, https://surveys.nces.ed.gov/ipeds/public/survey-materials/instructions?instructionid=30156, *with* ED OCR Compliance Review Information Request, Requests 13–14 (May 2, 2025).

April 12, 2026
Page 14

An encrypted zip file containing a production of documents in connection with the September 19 Letter (HRVD-EDOCR-6001-000000522 through HRVD-EDOCR-6001-000000584) has been posted via FTP.  We will send you the password needed to access the file under separate cover.

*    *    *

This production is not intended to, and does not, waive any applicable privilege or protection, including the attorney-client privilege or work product protection.  If any information that would be protected by the attorney-client privilege or work product doctrine was inadvertently produced, such production was not intended to be a waiver of any applicable privilege or protection, including pursuant to Fed. R. Evid. 502, and we respectfully request the prompt return of such privileged material.

On behalf of our client, we hereby claim that the materials provided to your office during the course of this matter, including this letter and the documents accompanying this letter (Bates-numbered  HRVD-EDOCR-6001-000000522  through  HRVD-EDOCR-6001-000000584)  are entitled to confidential treatment pursuant to the Freedom of Information Act ("FOIA").  We believe that the enclosed files qualify for exemption under the Freedom of Information Act, 5 U.S.C. § 552(b).  We believe that Exemptions 4, 6, 7(A), 7(B), 7(C), and 7(F) may also be applicable to the documents, as well as the protections available under the Department of Education's FOIA Regulations, 34 C.F.R. § 5.11, the Privacy Act of 1974, 5 U.S.C. § 552a, and 18 U.S.C. § 1905, which generally prohibit the disclosure of confidential information.

Certain documents have been appropriately labeled in accordance with 28 C.F.R. § 16.7(b) to indicate our intention to maintain the confidential status of the enclosed materials.  This claim of confidentiality shall continue indefinitely unless we advise you otherwise.  We expect that all documents and copies of documents produced in connection with this matter, including this letter, will be kept in a non-public file and that access to them by any third party not a member of your office will be denied.  Should your office receive any request for these documents, either pursuant to FOIA or otherwise, we request that you provide me with notice by telephone or e-mail, rather than relying upon the United States mail.

April 12, 2026
Page 15

       We further request that these materials be returned to us once your office has concluded its investigation.  If you have any questions regarding this matter, please call me at (202) 383-8969.

Sincerely,

Robert K. Hur

cc:    Michael Bennett, Compliance Team Leader, ED OCR