**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br> Defendant. | Case No. 1:26-cv-10844-MJJ |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR A STAY PENDING FINAL RESOLUTION OF
*MASSACHUSETTS V. DEPARTMENT OF EDUCATION***

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.    As the Government Is Aware, Harvard Changed Its Admissions Policies in Response to the Supreme Court's Decision in *Students for Fair Admissions* ...................................................................................................... 2

    II.    The Justice Department Began a Title VI Inquiry into Harvard but Abandoned Negotiations in Favor of Litigation ..................................................... 3

    III.    The Education Department Opened a Title VI Inquiry into Harvard but Refused to Respond to Harvard's Concerns ............................................................ 5

    IV.    The Government Persisted in a Retaliatory Campaign Against Harvard ............... 8

    V.    The Education Department Is Enjoined in the Related IPEDS Litigation ............ 10

STANDARD OF REVIEW ....................................................................................................11

ARGUMENT ......................................................................................................................12

    I.    The Government Did Not Comply with the Procedural Prerequisites to this Lawsuit................................................................................................................. 12

        A.    The Department of Justice Failed to Follow the Mandatory Procedural Steps Before Filing This Lawsuit .................................................13

        B.    The Department of Education Failed to Follow the Mandatory Procedural Steps for Enforcing Its Information Requests............................................15

    II.    The Government Seeks Information from Harvard for an Improper Purpose........................................................................................................ 16

    III.    The Contract Claim Should Be Dismissed ........................................................... 18

    IV.    Alternatively, the Court Should Stay This Case Pending a Decision in *Massachusetts v. Department of Education* ........................................................ 19

CONCLUSION....................................................................................................................20

i

# TABLE OF AUTHORITIES

## Cases

*United States ex rel. Accardi v. Shaughnessy,*
  347 U.S. 260 (1954)............................................................................................................13

*Adams v. Richardson,*
  351 F. Supp. 636 (D.D.C. 1972) .......................................................................................12

*In re Admin. Subpoena 25-1431-032 to R.I. Hosp.,*
  2026 WL 1392565 (D.R.I. May 14, 2026) ........................................................................14

*In re Admin. Subpoena No. 25-1431-019,*
  800 F. Supp. 3d 229 (D. Mass. 2025)................................................................................16

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)..............................................................................................................1

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................................................11

*Bennett v. Kentucky Dep't of Educ.,*
  470 U.S. 656 (1985)............................................................................................................18

*Brait Builders Corp. v. Mass., Div. of Cap. Asset Mgmt.,*
  644 F.3d 5 (1st Cir. 2011)..................................................................................................11

*Campagna v. Mass. Dep't of Env't Prot.,*
  206 F. Supp. 2d 120 (D. Mass. 2002) ...............................................................................17

*Dept. of Com. v. New York,*
  588 U.S. 752 (2019)............................................................................................................17

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012)............................................................................................................12

*Gagliardi v. Sullivan,*
  513 F.3d 301 (1st Cir. 2008)..............................................................................................11

*Good v. Altria Grp., Inc.,*
  624 F. Supp. 2d 132 (D. Me. 2009) ...................................................................................19

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted],*
  2026 WL 710202 (D.D.C. Mar. 13, 2026).........................................................................16

*Guillemard-Ginorio v. Contreras-Gomez,*
  585 F.3d 508 (1st Cir. 2009)..............................................................................................18

*In re Keeper of Recs.,*
  348 F.3d 16 (1st Cir. 2003)................................................................................................12

*Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.,*
  360 U.S. 684 (1959)............................................................................................................17

*Marquis v. F.D.I.C.*,
  965 F.2d 1148 (1st Cir. 1992)...........................................................................................19

*Massachusetts v. Dep't of Educ.*,
  26-cv-11229 (D. Mass.) ...................................................................................................19

*Massachusetts v. Dep't of Educ.*,
  26-cv-11229 (D. Mass. Apr. 3, 2026)..............................................................................11

*Massachusetts v. Dep't of Educ. (Mass. I)*,
  2026 WL 918941 (D. Mass. Apr. 3, 2026) ......................................................................20

*Massachusetts v. Dep't of Educ.* (*Mass. II*),
  2026 WL 1114877 (D. Mass. Apr. 24, 2026) .............................................................11, 19

*Microfinancial, Inc. v. Premier Holidays Int'l Inc.*,
  385 F.3d 72 (1st Cir. 2004)..............................................................................................19

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021).......................................................................................................1, 12

*O'Brien v. Deutsche Bank Nat'l Tr. Co.*,
  948 F.3d 31 (1st Cir. 2020)..............................................................................................11

*Massachusetts ex rel. Powell v. Holmes*,
  546 F. Supp. 3d 58 (D. Mass. 2021) ................................................................................11

*President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*,
  788 F. Supp. 3d 182 (D. Mass. 2025) ................................................................................9

*President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum.
  Servs. (Harvard v. HHS)*,
  798 F. Supp. 3d 77 (D. Mass. 2025) ...............................................................1, 4, 8, 9, 17

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*,
  600 U.S. 181 (2023).......................................................................................................1, 2

*United States v. Arkansas*,
  2011 WL 251107 (E.D. Ark. Jan. 24, 2011).....................................................................13

*United States v. Harris Methodist Fort Worth*,
  970 F.2d 94 (5th Cir. 1992) .......................................................................................17, 18

*United States v. Powell*,
  379 U.S. 48 (1963).....................................................................................................12, 16

*United States v. Sturm, Ruger & Co.*,
  84 F.3d 1 (1st Cir. 1996).......................................................................................12, 16, 18

*United States v. Tivian Lab'ys, Inc.*,
  589 F.2d 49 (1st Cir. 1978).......................................................................................12, 16

## Statutes

42 U.S.C. § 2000d-1 .................................................................................12, 13, 14, 15

## Rules

Fed. R. Evid. 201(b)...............................................................................................11

## Regulations

28 C.F.R. § 50.3 ...........................................................................................13, 14, 16

28 C.F.R. § 42.108(d)(1)........................................................................................14

28 C.F.R. § 42.108(d)(3)....................................................................................14, 15

34 C.F.R. § 100.6(a).............................................................................................16

34 C.F.R. § 100.7(d)(1).........................................................................................16

34 C.F.R. § 100.8(d)(2).........................................................................................16

34 C.F.R. § 100.8(d)(3).........................................................................................16

90 Fed. Reg. 24,493 (June 4, 2025) .........................................................................9

Notice, 90 Fed. Reg. 39,384, 39,385 (Aug. 15, 2025)................................................10

## Other Authorities

Betsy Klein, *'Don't negotiate, Linda': Trump calls for $500 million Harvard settlement*, CNN (Aug. 26, 2025), https://www.cnn.com/2025/08/26/politics/harvard-trump-500-million-settlement. ...................................................................................................4

*Brainstorm New Harvard Measures,* Politico (May 30, 2025), https://www.politico.com/news/2025/05/30/white-house-convenes-meeting-to-brainstorm-new-harvard-measures-00376782......................................................9

C. Todd Lopez, *War Department Cuts Ties With Harvard University*, U.S. Dep't of War (Feb. 6, 2026), https://www.war.gov/News/News-Stories/Article/Article/4399812/war-department-cuts-ties-with-harvard-university/ ...............................................................................................9

Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 16, 2025, 7:05 AM), https://truthsocial.com/@realDonaldTrump/posts/114347313852363347..............................8

Donald J. Trump (@realDonaldTrump), Truth Social (Feb 2, 2026, 11:20 PM), https://truthsocial.com/@realDonaldTrump/posts/116004776659519984............................10

Linda McMahon, Sec'y of Educ., Memorandum to the Acting Dir., Inst. of Educ. Scis. & Acting Comm'r, Nat'l Ctr. for Educ. Stat., Ensuring Transparency in Higher Education Admissions (Aug. 7, 2025).........................................................11

*Marc Labonte & Lida R. Weinstock, Cong. Rsch. Serv., R48832, The 2025 (FY2026) Government Shutdown: Economic Effects (2026),* https://www.congress.gov/crs-product/R48832. ........................................................................4

Jared P. Cole, Cong. Rsch. Serv. R45665*, Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964* (2019) ............................................13

President Donald J. Trump, Ensuring Transparency in Higher Education Admissions, Memorandum for the Secretary of Education, § 3 (Aug. 7, 2025) .....................10

*Remarks: Donald Trump Attends a Black History Month Reception at the White House* (Feb. 18, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-black-history-month-reception-february-18-2026/ ........................................10

Sophia Cai & Megan Messerly, *White House Convenes Meeting to Brainstorm New Harvard Measures,* Politico (May 30, 2025), https://www.politico.com/news/2025/05/30/white-house-convenes-meeting-to-brainstorm-new-harvard-measures-00376782 ................................................................9

Tunku Varadarajan, *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*, Wall Street Journal (Mar. 27, 2026) ..................................................................................10

U.S. Dep't of Educ.*, U.S. Department of Education Places Harvard University on Heightened Cash Monitoring for Financial Responsibility Concerns* (Sept. 19, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-places-harvard-university-heightened-cash-monitoring-financial-responsibility-concerns ..............................................................................................9

U.S. Dep't of Education, *Victories for Higher Education: Raising Academic Standards and Ensuring Admissions Transparency* (March 27, 2026), https://www.ed.gov/about/news/press-release/victories-higher-education-raising-academic-standards-and-ensuring-admissions-transparency.......................................8

The White House, *President Trump Participates in a Cabinet Meeting* (April 30, 2025 at 1:21:57, 1:22:46) https://www.youtube.com/watch?v=wn2XtufOAHc ........................5

## **INTRODUCTION**

As part of the Trump Administration's ongoing campaign against Harvard since the University refused its unconstitutional demand to cede control over what Harvard can teach and whom it admits or hires, *see President & Fellows of Harvard Coll. v. United States Dep't of Health & Hum. Servs. (Harvard v. HHS)*, 798 F. Supp. 3d 77, 117–125 (D. Mass. 2025), the Government in this case has elected to rush into court, disregarding not only the "elaborate restrictions" Congress placed on agency enforcement in Title VI, *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001), but also the detailed regulations promulgated by the Departments of Justice and Education. These requirements are not technicalities, and the Government is bound to "turn square corners" in compliance. *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). It has failed to do so here.

The Amended Complaint states that "the United States does not accuse Harvard of any discriminatory conduct." This is instead a procedural case about documents that are unnecessary and vastly overbroad for the alleged purpose of confirming Harvard's compliance with the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College (SFFA)*, 600 U.S. 181 (2023). The Departments of Justice and Education have demanded sensitive, identifiable records on hundreds of thousands of applicants over the last decade, including personal essays and life histories (some of which include sensitive medical information). Harvard already has produced thousands of pages of documents about its admissions policies and procedures demonstrating compliance with *SFFA*, accompanied by a detailed explanation of the changes made as part of, or in addition to, the final judgment in *SFFA* itself. The Government claims these productions and explanations are insufficient, but it never explained why, nor has it responded to Harvard's objections about the unreasonableness and irrelevance of many of the Government's requests. Instead, when the Government did not receive everything it demanded, it simply sued in violation of Title VI and implementing regulations.

1

A government demand for information must comply with the proper procedures and be for a proper purpose to be enforceable in court. Here, the Departments skipped multiple steps required by statute and their own regulations before bringing this case. The Assistant Attorney General overseeing this lawsuit publicly connected the dots to the Administration's anti-Harvard campaign by explaining that this case was filed because Harvard "sued" the Government and "is defiant." The Government's demands therefore are unenforceable, and the lawsuit should be dismissed.

Alternatively, if the Court does not dismiss the Amended Complaint in its entirety, at the very least it should stay this case pending final judgment in *Massachusetts v. Department of Education*, 26-cv-11229 (D. Mass.). There, Judge Saylor has preliminarily enjoined the Department of Education's attempt to obtain the same or similar types of information for the same purported purpose of enforcing Title VI. The Government amended its complaint in this case to add the Department of Education as a plaintiff just 10 days after that injunction was extended to include Harvard, exposing this case as an end-run around an order issued by another judge in this District. As a matter of judicial efficiency, the Court at a minimum should await the outcome of that litigation, which the Department says it is seeking to resolve expeditiously.

## BACKGROUND

**I.    As the Government Is Aware, Harvard Changed Its Admissions Policies in Response to the Supreme Court's Decision in *Students for Fair Admissions***

In 2023, the Supreme Court announced a major shift in the law governing consideration of race in university admissions and other activities. *SFFA*, 600 U.S. at 213. It held that, although universities may still "consider[] an applicant's discussion of how race affected his or her life," they may no longer confer a benefit on an applicant simply "on the basis of race." *Id.* at 230–231.

As Harvard has explained to both the Justice and Education Departments, Harvard immediately changed its policies in response to the decision in consultation with the *SFFA* plaintiffs.

Within a month, Harvard "issued a memorandum … that was distributed to admissions leadership regarding 'Required Changes to Admissions Practices Following Supreme Court Decision in *SFFA v. Harvard*.'" Doc No. 27-14 at 4–5. This document, the "Admissions Memo"—which was included, among other places, in the guidance and handbooks given to admissions readers and interviewers at Harvard College—stated plainly that "Harvard is no longer allowed to provide any admissions advantage to an applicant on the basis of race." *Id.* at 5–6. Among other changes, it directed leadership to "remove from your admissions staff access to any uncontextualized information about race or ethnicity (i.e., any 'box' checked by an applicant about race or ethnicity)." *Id.* Harvard shared these new measures with the *SFFA* plaintiffs, who concluded that Harvard's actions were satisfactory and sufficient to move jointly for the entry of final judgment. *Id.* at 6–7.

## II.    The Justice Department Began a Title VI Inquiry into Harvard but Abandoned Negotiations in Favor of Litigation

In April 2025, the Justice Department's Civil Rights Division launched Title VI "compliance reviews" of Harvard's admissions policies supposedly to determine compliance with *SFFA*. Am. Compl. ¶¶ 25–26. On April 11—the same day, as discussed below, the Government unlawfully demanded that Harvard make core governance and academic changes—the Justice Department opened an investigation into Harvard College and Harvard Medical School. Doc No. 27-3 at 2–3; Doc No. 27-5 at 2–3. On April 18—four days after Harvard rejected the unconstitutional demands—the Department opened a similar investigation into Harvard Law School. Doc No. 27-4 at 2–3. The Department requested a broad swath of documents going back five years, ranging from "any and all relevant documents guiding your admissions policies and procedures" to "all admissions data" "disaggregated by race and ethnicity." Doc No. 25-2 at 3; Doc No. 27-3 at 2, Doc No. 27-4 at 2. It also demanded highly sensitive personal information (such as essays,

disciplinary records, and documentation of medical and other hardships) from hundreds of thousands of applicants who had no expectation this material might be given to the Government. *Id*.

After preliminary discussions with the Department, Harvard made its first production on May 16, consisting of around 1,000 pages. Am. Compl. ¶ 31; Doc No. 27-6. On May 30, Harvard produced 1,300 more pages, including racial demographic data of Harvard's classes, internal admissions guidelines, and its nonpublic Admissions Memo. *Id.* ¶ 33 & n.7.

Harvard heard nothing from the Justice Department for over three months, until September 8 and 12, just days after the district court ruled in *Harvard v. HHS* that the Government had violated Harvard's First Amendment rights, 798 F. Supp. 3d at 121, and a week after the President said Harvard needed to pay $500 million because it had been "very bad."[1] The Department sent letters to Harvard Medical School and College demanding significantly more information than the original requests. *See* Doc No. 27-7 at 4–8, Doc No. 27-8 at 4–7. The Medical School letter sought 38 data points about every applicant over the last six years and 23 other categories of documents related to the Medical School's admissions practices. Doc No. 27-7 at 4–8. The College letter sought 51 sensitive data points about each applicant—including their full names and addresses, family income bracket, misconduct records, and employment, research, and volunteering history— as well as 21 other categories of documents. Doc No. 27-8 at 4–7. The Justice Department gave Harvard only one month, until October 10, to respond to its new demands. Doc No. 27-9, 27-10.

The response was interrupted when federal appropriations lapsed on October 1 and the government "shut down."[2] As an exhibit to the Amended Complaint explains, "[d]uring the

---

[1] *See* Betsy Klein, *'Don't negotiate, Linda': Trump calls for $500 million Harvard settlement*, CNN (Aug. 26, 2025), https://www.cnn.com/2025/08/26/politics/harvard-trump-500-million-settlement.

[2] *See* Marc Labonte & Lida R. Weinstock, Cong. Rsch. Serv., R48832, *The 2025 (FY2026) Government Shutdown: Economic Effects* (2026), https://www.congress.gov/crs-product/R48832.

government shutdown, … the government committed to notify Harvard when appropriations were restored and Harvard should reengage regarding agency requests and investigations." Doc No. 27-19 at 4 n.3. The Amended Complaint does not allege any negotiations or discussions during or after the government shutdown. Instead, the Justice Department filed this case on February 13, 2026, with a press release and a social media post but without any further communication with Harvard.

### III.    The Education Department Opened a Title VI Inquiry into Harvard but Refused to Respond to Harvard's Concerns

On May 2, 2025, two days after a Cabinet meeting in which the President stated that Harvard was "scamming the public" and in which Secretary McMahon assured President Trump the Education Department was "staying tough" with Harvard,[3] the Department of Education Office for Civil Rights (OCR) sent Harvard a letter commencing a compliance review over "whether Harvard [College] discriminates against applicants and potential applicants on the basis of race in its undergraduate admissions process." Doc No. 27-12; *see also* Am. Compl. ¶ 54. The letter gave no reason why Harvard had been selected for a review. *See* Doc No. 27-12. The letter included 18 interrogatories and requested 17 categories of documents. Am. Compl. ¶ 55. One of the requests called for "individualized, anonymized data for each applicant, admitted student, and enrolled student," including race, GPA, and standardized test scores. *Id.* ¶ 56 (emphasis omitted). Far beyond admissions practices, the requests asked about matters such as demographic surveys sent to faculty and "all race-conscious offices, officials, practices, policies, initiatives, clubs, programs, events, orientations, trainings, awards, ceremonies, grants, contracts, scholarships, graduation requirements, housing, counseling, mentoring, and internships at Harvard." Doc No. 27-13 at 4, 8.

---

[3] The White House, *President Trump Participates in a Cabinet Meeting* (April 30, 2025 at 1:21:57, 1:22:46), https://www.youtube.com/watch?v=wn2XtufOAHc.

Harvard responded on June 17, including a letter and appendix describing the changes it had implemented after *SFFA* and the impact of those changes on student enrollment by race. Doc No. 27-14. Harvard also provided OCR with the Admissions Memo and about 500 pages of materials documenting its admissions policies and practices. *Id.* at 2; Am. Compl. ¶ 57. A month later, on July 17, the Education Department responded, claiming that Harvard's response was "deficient" because the University had not provided every requested document, with no explanation why the information provided by Harvard was insufficient to evaluate Harvard's compliance with Title VI. Am. Compl. ¶ 59; Doc No. 27-15.

Harvard responded two weeks later objecting to the Department's requests as "unduly burdensome[] and unnecessary to ascertain Harvard's current compliance with Title VI." Doc No. 27-16 at 2. Harvard explained that it was "aware of no factual basis or evidence" for the investigation, that the requests covered a "nearly 10-year period" long-predating *SFFA* and well outside the statute of limitations, and that the demands were "overbroad," "burdensome," pretextual, and, in certain cases, entirely irrelevant. *Id*. at 4. Nevertheless, Harvard produced additional documents and offered to meet and confer with the Government to discuss the remaining requests. *Id*. at 2.

Rather than take Harvard up on its offer, on September 19, OCR responded with a letter finding a "denial of access" under Title VI because Harvard had not provided all the requested information; the letter did not mention (or respond to) Harvard's objections. *See* Doc No. 27-17 at 2. The letter described Harvard's response as "deficient and unresponsive" and threatened that "[i]f Harvard does not voluntarily provide OCR with access to the requested information and materials within 20 calendar days of this letter, OCR will issue a Letter of Impending Enforcement Action to initiate the OCR's enforcement action process." *Id.* at 3; Am. Compl. ¶ 61.

6

The next communication from the Education Department was six months later, on March 23, 2026, when it sent Harvard a "Letter of Impending Enforcement Action." Am. Compl. ¶ 62; Doc No. 27-18. The letter stated that, based on Harvard's alleged "failure to provide access to the requested evidence, OCR will either (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from funds made available through the Education Department to the recipient; or (2) refer the case to DOJ for judicial proceedings to enforce any rights of the United States under any law of the United States." Am. Compl. ¶ 62; Doc No. 27-18 at 4. The letter did not say which option the Education Department would choose or acknowledge any of Harvard's prior responses or its offer to meet and confer.

Harvard provided a further 15-page submission on April 12, 2026, explaining that OCR "neither substantively responded to Harvard's repeated objections and concerns regarding the breadth, relevance, and purpose of ED OCR's sweeping requests, nor engaged with Harvard at all on the substance of its narrative and document responses." Doc No. 27-19 at 2. Harvard explained that the investigation had not complied with the Department's own regulations and Case Processing Manual, that OCR had failed to pursue a voluntary resolution, and that its requests were overbroad, unduly burdensome, unnecessary to determine Title VI compliance, and issued for improper purposes. *Id.* at 4–14. Nevertheless, Harvard again produced additional responsive documents. *Id.* at 14–15. The Education Department ignored these objections for a third time. On April 24, it referred the case to the Justice Department. Doc No. 27-20. Harvard next heard about the Education investigation in the Amended Complaint on May 4, 2026. *See* Doc No. 27.

At the same time that the Department of Education was claiming it needed all the information it was demanding to determine whether Harvard was complying with Title VI and citing Harvard for noncompliance with document demands, it issued a press release stating that Harvard

was "bringing back excellence in higher education and returning to admission based on merit" and had "seen substantial shifts in their admissions for the class of 2029" following *SFFA*.[4]

**IV.    The Government Persisted in a Retaliatory Campaign Against Harvard**

Harvard has endured a "government-initiated onslaught" for more than a year designed to "promot[e] a governmental orthodoxy in violation of the First Amendment." *Harvard v. HHS*, 798 F. Supp. 3d at 122. President Trump has publicly expressed his beliefs that "Harvard has 'lost its way,'" that it "has been hiring almost all woke, Radical Left, idiots and 'birdbrains,'" and that "Harvard is a JOKE."[5] The rest of the Executive Branch has followed the President's lead.

On April 11, 2025, the Education Department and other agencies sent Harvard "a list of conditions that Harvard had to satisfy to 'maintain Harvard's financial relationship with the federal government.'" *Harvard v. HHS*, 798 F. Supp. 3d at 94–95. The demands included "'hiring a critical mass of new faculty'" and "'admitting a critical mass of students' to provide the government's preferred balance of viewpoint diversity." *Id.* at 95. Within hours after Harvard rejected its unconstitutional demands, the Government froze $2.2 billion in grants and $60 million in contracts awarded to Harvard. *Id.* at 96. After Harvard sued, U.S. District Court Judge Allison Burroughs issued a detailed summary judgment decision finding that these actions violated Title VI and the First Amendment. *Id.* at 116–28, 132–33.

The funding freeze was only the first retaliatory step. According to public reporting, the White House convened officials from nearly a dozen agencies to discuss additional measures

---

[4] U.S. Dep't of Education, *Victories for Higher Education: Raising Academic Standards and Ensuring Admissions Transparency* (March 27, 2026), https://www.ed.gov/about/news/press-release/victories-higher-education-raising-academic-standards-and-ensuring-admissions-transparency.

[5] Donald J. Trump (@realDonaldTrump), Truth Social (Apr. 16, 2025, 7:05 AM), https://truth-social.com/@realDonaldTrump/posts/114347313852363347.

targeting Harvard; a White House spokesperson said about this meeting: "The latest moves against Harvard are truly just scratching the surface," and Harvard would suffer a "self-inflicted demise."[6] Following through, the Administration has targeted Harvard's international and military education programs, among other actions.[7] The Education Department (on the same day it sent its denial of access letter) subjected Harvard to "heightened cash monitoring," an extraordinary measure requiring Harvard to submit a $36 million letter of credit and to front student-aid disbursements from its own funds before drawing down federal aid.[8]

Throughout, the Government has publicly acknowledged that its actions are a response to Harvard's exercise of its rights. The Secretary of Education explained early on that because "Harvard's answer was a lawsuit," the Government was focused on "how [to] really make our point." *Harvard v. HHS*, 798 F. Supp. 3d at 102. The President later remarked that "every time [Harvard] fight[s], they lose another $250 million." *Id.* And on February 2, 2026, he said he was ending any settlement talks, declaring that "Harvard has been, for a long time, behaving very badly" and the Government "want[s] nothing further to do, in the future, with Harvard University."[9]

---

[6] Sophia Cai & Megan Messerly, *White House Convenes Meeting to Brainstorm New Harvard Measures,* Politico (May 30, 2025), https://www.politico.com/news/2025/05/30/white-house-convenes-meeting-to-brainstorm-new-harvard-measures-00376782.

[7] Proclamation No. 10948, Enhancing National Security by Addressing Risks at Harvard University, 90 Fed. Reg. 24,493 (June 4, 2025); *President & Fellows of Harvard Coll. v. U.S. Dep't of Homeland Sec.*, 788 F. Supp. 3d 182 (D. Mass. 2025) & 2025 WL 1719206, at *1 (D. Mass. June 20, 2025). C. Todd Lopez, *War Department Cuts Ties With Harvard University*, U.S. Dep't of War (Feb. 6, 2026), https://www.war.gov/News/News-Stories/Article/Article/4399812/war-department-cuts-ties-with-harvard-university/.

[8] Press Release, U.S. Dep't of Educ*.,* U.S. Department of Education Places Harvard University on Heightened Cash Monitoring for Financial Responsibility Concerns (Sept. 19, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-places-harvard-university-heightened-cash-monitoring-financial-responsibility-concerns.

[9] Donald J. Trump (@realDonaldTrump), Truth Social (Feb 2, 2026, 11:20 PM), https://truth-social.com/@realDonaldTrump/posts/116004776659519984.

Less than two weeks after that presidential statement, on February 13, 2026, the Department of Justice filed this lawsuit. The Assistant Attorney General for the Civil Rights Division, Harmeet Dhillon, later explained that the Justice Department targeted Harvard to get its "bang for the buck" because Harvard is "disproportionately influential and global" and because Harvard "sued [the Government]" and "is defiant."[10] A few days after this lawsuit was filed, the President publicly told Dhillon: "Good, good. You keep suing them [Harvard]. To hell with them."[11]

## V.    The Education Department Is Enjoined in the Related IPEDS Litigation

The Government has also sought to obtain admissions data from universities more generally. On August 7, 2025, President Trump directed the Secretary of Education to "expand the scope of the required reporting" under the Integrated Postsecondary Education Data System (IPEDS), a federal repository of data from American universities.[12] Secretary McMahon then directed an expansion of the IPEDS data collection to uncover "important information that could reveal whether universities are discriminating against applicants based on race."[13] The Government sought "data by race-sex pair," including standardized test scores and GPA, for "institutions' applied, admitted, and enrolled cohorts." Notice, 90 Fed. Reg. 39,384, 39,385 (Aug. 15, 2025) (noting that purpose was to "ensure widespread compliance with Title VI").

---

[10] Tunku Varadarajan, *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*, Wall Street Journal (Mar. 27, 2026), https://www.wsj.com/opinion/harmeet-dhillon-trumps-civil-rights-enforcer-in-action-9e93b66d.

[11] *Remarks: Donald Trump Attends a Black History Month Reception at the White House* (Feb. 18, 2026), https://rollcall.com/factbase/trump/transcript/donald-trump-remarks-black-history-month-reception-february-18-2026/.

[12] President Donald J. Trump, Ensuring Transparency in Higher Education Admissions, Memorandum for the Secretary of Education, § 3 (Aug. 7, 2025).

[13] Linda McMahon, Sec'y of Educ., Memorandum to the Acting Dir., Inst. of Educ. Scis. & Acting Comm'r, Nat'l Ctr. for Educ. Stat., Ensuring Transparency in Higher Education Admissions (Aug. 7, 2025).

States and associations of private universities sued to enjoin the enforcement of the new requirements. U.S. District Court Judge Dennis Saylor preliminarily enjoined the Education Department from "seek[ing] civil penalties, bring[ing] any enforcement action, or otherwise penaliz[ing] plaintiffs in any manner for not submitting the data required by the ACTS survey component," including from Harvard and other private universities. Doc No. 143 at 2, *Massachusetts v. Dep't of Educ.*, 26-cv-11229 (D. Mass. Apr. 3, 2026); *Massachusetts v. Dep't of Educ.* (*Mass. II*), 2026 WL 1114877, at *5, 14 (D. Mass. Apr. 24, 2026). That injunction remains in force while the IPEDS litigation proceeds. The Education Department has moved to remand the new IPEDS requirement back to the agency with the purported goal of "efficiently resolv[ing the case] on the merits after the remand." Doc No. 196 at 10, 26-cv-11229.

## STANDARD OF REVIEW

The Amended Complaint must be dismissed if it fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court may consider properly pleaded factual allegations as well as documents incorporated by reference in the Amended Complaint and facts susceptible to judicial notice, including facts generally known whose accuracy cannot reasonably be questioned. *See O'Brien v. Deutsche Bank Nat'l Tr. Co.*, 948 F.3d 31, 33 (1st Cir. 2020); Fed. R. Evid. 201(b). Because "an amended complaint" renders "the earlier complaint … a dead letter," Harvard's answer to the original Complaint "is void." *Massachusetts ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 67 (D. Mass. 2021); *see also Brait Builders Corp. v. Mass., Div. of Cap. Asset Mgmt.*, 644 F.3d 5, 9 (1st Cir. 2011).

11

## ARGUMENT

When a federal agency exercises its authority to demand documents from a private party, courts evaluate whether the request "is issued for a congressionally authorized purpose," "the information sought is [] relevant to the authorized purpose," the information is "adequately described," and the "proper procedures have been employed in issuing the" demand. *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1996); *see also United States v. Powell*, 379 U.S. 48, 58 (1963); *United States v. Tivian Lab'ys, Inc.*, 589 F.2d 49, 53–54 (1st Cir. 1978). On its face, the Amended Complaint demonstrates the failure of the requests at issue in this case to satisfy these requirements. The Government's demands for information are significantly overbroad and not relevant, did not comply with proper procedures, and were not issued for a proper purpose. The Amended Complaint should therefore be dismissed.

## I.    The Government Did Not Comply with the Procedural Prerequisites to this Lawsuit

"If [individuals] must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez*, 593 U.S. at 172; *see also In re Keeper of Recs.*, 348 F.3d 16, 26 (1st Cir. 2003) (same). "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). It follows that when an agency wishes to compel information from a private citizen or entity, the demand is unenforceable unless the Government establishes that "proper procedures have been employed." *Sturm, Ruger*, 84 F.3d at 4. In Title VI, Congress forbade federal agencies from taking coercive measures to enforce the statute until the agency first determines that compliance – including with respect to document requests – "cannot be secured by voluntary means." 42 U.S.C. § 2000d-1; *see Adams v. Richardson*, 351 F. Supp. 636, 641 (D.D.C. 1972) (under Title VI, agencies must "attempt at the outset to secure compliance by voluntary means, if

12

such method is reasonably possible").[14] The Justice and Education Departments have each issued comprehensive regulations to ensure they follow this mandate and provide opportunities for meaningful negotiations prior to coercive action to enforce requests for information. "[A]s long as the[se] regulations remain operative, the Attorney General denies himself the right to sidestep [them]." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954). If, as here, the Amended Complaint demonstrates that the Government filed suit to enforce Title VI without following the required procedural steps, the case must be dismissed. *See, e.g.*, *United States v. Arkansas*, 2011 WL 251107, at *7 (E.D. Ark. Jan. 24, 2011).

### A. The Department of Justice Failed to Follow the Mandatory Procedural Steps Before Filing This Lawsuit

The Amended Complaint's allegations show the Justice Department violated its procedural obligations under Title VI and the Department's implementing regulations in at least three ways.

First, the Department ignored its duty to make a good-faith effort to reach a "voluntary" resolution with Harvard concerning the document and data requests before suing. 42 U.S.C. § 2000d-1. Consistent with Title VI's mandate, the Department must make a "concerted effort . . . to persuade any noncomplying applicant or recipient voluntarily to comply with title VI." 28 C.F.R. § 50.3. "Efforts to secure voluntary compliance should be undertaken at the outset in every noncompliance situation and should be pursued through each stage of enforcement action." *Id.* The Amended Complaint does not allege that the parties had reached an impasse on the documents. To the contrary, within a few weeks of receiving the April letters, Harvard responded with initial

---

[14] *See also* Jared P. Cole, Cong. Rsch. Serv., R45665, *Civil Rights at School: Agency Enforcement of Title VI of the Civil Rights Act of 1964* 4 n.28 (2019) (citing Stephen C. Halpern, On the Limits of the Law: The Ironic Legacy of Title VI of the 1964 Civil Rights Act (1995), for the proposition that "[i]t would be hard to overestimate the significance of the procedural protections Congress placed in the statute," which "encumbered those who would have to wield th[e] power" Title VI granted), https://www.congress.gov/crs-product/R45665#fn8.

productions. *Supra* p. 4. When, after three months of radio silence, the Department sought more records related to the College and Medical School, Harvard responded promptly and agreed to "engage constructively with [the Government] and to cooperate with [its] review."[15] Doc No. 27-10. The extended shutdown then intervened, and the Department never reengaged; it waited four months, then sued without notice or warning. While the Government has not sought to establish the reasons the documents Harvard has already produced are insufficient, to the extent it can identify any additional documents it needs, the Government has not engaged in the "concerted effort" at a resolution the law mandates. 28 C.F.R. § 50.3. This approach is contrary to the "well established" principle that agencies "are responsible for working in a cooperative, rather than an adversarial manner, and to confer in good faith when negotiating the parameters" of a Government demand for information. *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, 2026 WL 1392565, at *2 (D.R.I. May 14, 2026) (internal quotation marks omitted).

Second, the Justice Department was required to formally "determine[] that compliance [with appropriate information requests] cannot be secured by voluntary means." 28 C.F.R. § 42.108(d)(1). The Amended Complaint nowhere alleges that a responsible official did so.

Third, the Justice Department never "advised [Harvard] of the failure to comply" with the information requests and "the action to be taken to effect compliance." 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.108(d)(3). The Amended Complaint cites no occasion on which the Justice Department informed Harvard that it had found a legal violation and was planning to sue. The Amended Complaint alleges this notice was provided in September 2025 when the Justice Department told Harvard by email that its "failure to produce 'all of the requested data by October 10th' *would* be

---

[15] The Justice Department made even less of an effort to negotiate over the Law School records it now seeks: After Harvard responded to the Law School letter in May with documents, Harvard never heard from the Department about those requests again until this lawsuit. *See supra* p. 4–5.

viewed as a failure to cooperate with the United States." *See* Am. Compl. ¶ 77 (emphasis added); Doc No. 27-9. That conditional forward-looking statement—the Government's last substantive communication on the requests prior to this lawsuit, *supra* pp. 4–5—cannot constitute the required notice. The statute and regulations require the Government to notify its target of "*the* failure" to comply, 42 U.S.C. § 2000d-1 (emphasis added), and "*the* action to be taken to effect compliance," 28 C.F.R. § 42.108(d)(3) (emphasis added). The notification requirement ensures that, when an agency is on the brink of an aggressive enforcement action, the agency and funding recipient can work together to address the Government's information requests. That aim would be thwarted if all Title VI required was a warning on what might violate the law in the future.

### B. The Department of Education Failed to Follow the Mandatory Procedural Steps for Enforcing Its Information Requests

The Education Department also did not comply with the proper procedures specified by Title VI and agency requirements. The Education Department regulations implementing Title VI, 34 C.F.R. Part 100, and its OCR Case Processing Manual[16] prescribe several steps the Department must take before referring an alleged Title VI violation to the Justice Department for enforcement, all of which are designed to ensure that the Department communicates the basis for its requests and pursues voluntary compliance before resorting to enforcement.

The Education Department skipped many of these steps. After sending a "Letter of Impending Enforcement Action," the Department did not engage in "post-Letter … negotiations" about the information requests, which Harvard expressly invited. *See* Manual § 602; Doc No. 27-16 (July 31, 2025) at 2 ("[W]e are open to meeting and conferring with you regarding any

---

[16] "The Case Processing Manual ("Manual") provides OCR with the procedures to promptly and effectively investigate and resolve complaints, compliance reviews and directed investigations to ensure compliance with the civil rights laws and regulations enforced by OCR." Manual, Intro.

15

remaining concerns."). The Education Department also never "issue[d] a letter to [Harvard] stating that the case will be referred to DOJ in 10 days from the date of the letter," Manual § 602, so it failed to satisfy the requirement of 34 C.F.R. § 100.8(d)(2) that it notify Harvard of the "action to be taken to effect compliance." Naturally, this meant that no further "efforts [were] made" during the 10 days before the DOJ referral "to persuade [Harvard] to comply," *id.* § 100.8(d)(3). Nor did the Department "explain [its] authority to obtain the evidence" it was seeking, even as Harvard repeatedly objected that the requests were improper and outside the investigation's scope. *See* Manual § 603. Harvard next heard from the Education Department with the Amended Complaint.

Given the Education Department's failure to follow these procedural steps, it is unsurprising that the Department also ignored its general duty under Title VI, 28 C.F.R. § 50.3, and 34 C.F.R. §§ 100.6(a), 100.7(d)(1), to attempt to secure voluntary compliance with the document demands. *See supra* pp. 13–15. It did not respond to or engage substantively with Harvard's submissions demonstrating compliance with Title VI and *SFFA* or its objections about the information requests. Instead, the Government simply demanded full production of everything it requested.

## II.    The Government Seeks Information from Harvard for an Improper Purpose

It is unsurprising that the Government failed to comply with the statute and regulations because this case and the underlying reviews are part of the Government's retaliatory campaign against Harvard. Because "[a] court may not permit its process to be abused," courts will not enforce a subpoena or similar request when their process is invoked for an "improper purpose." *Powell*, 379 U.S. at 58; *see also Tivian*, 589 F.2d at 54 ("[W]hat the fourth amendment requires as a condition to enforcement of an agency subpoena is a showing by the agency [] that its investigation … is for a purpose Congress can order."); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (same); *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *5 (D.D.C. Mar. 13, 2026) (same). The "agency must prove" a

16

proper purpose to enforce its requests. *See Sturm, Ruger*, 84 F.3d at 4. If it fails to do so, the court will not enforce the request. *See*, *e.g.*, *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 101–02 (5th Cir. 1992) (refusing to enforce an information demand under Title VI because of the arbitrary way in which "the administrative agency designated the target of the search").

This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dept. of Com. v. New York*, 588 U.S. 752, 785 (2019) (citation omitted). The Government is suing Harvard for the same reason it has assailed the University in many other ways for over a year: to retaliate for its exercise of First Amendment rights. In April 2025, at the same time it began its Title VI investigation into Harvard, the Government launched an "onslaught against Harvard" to retaliate against Harvard's exercise of academic freedoms and "promot[e] a governmental ortho-doxy in violation of the First Amendment." *Harvard v. HHS*, 798 F. Supp. 3d at 121–22; *see generally supra* p. 8. Statements from both the Assistant Attorney General overseeing this lawsuit and the President confirm this litigation is part of that retaliatory campaign. In an interview, the Assistant Attorney General said the Justice Department filed this lawsuit because "Harvard sued us" and is a "thought leader." *See supra* p. 2. Litigation and academic thought are, of course, core First Amendment freedoms that cannot be a proper motivation for government censure. *See Cam-pagna v. Mass. Dep't of Env't Prot.*, 206 F. Supp. 2d 120, 124 (D. Mass. 2002); *Kingsley Int'l Pictures Corp. v. Regents of Univ. of State of N.Y.*, 360 U.S. 684, 688 (1959).

The Amended Complaint confirms that the Government singled out Harvard for targeted enforcement. The Amended Complaint alleges that the Justice Department "is investigating ad-missions processes in more than eighty undergraduate programs, medical schools, and law schools around the country, including many of Harvard's peers" and that the Education Department is investigating some unstated number more. Am. Compl. ¶¶ 68–69. Yet only Harvard has been sued

17

over document requests, even though the agencies "do[] not accuse Harvard of any discriminatory conduct." Am. Compl. at 2. As to the Justice Department, the Government alleges that "*[n]early all of the elite universities*" have "produced or pledged to produce applicant-level admissions data." *Id.* ¶ 69 (emphasis added). This allegation confirms, however, that not all "elite" universities, and presumably even fewer other universities, have produced applicant-level admissions data. Even among the schools that allegedly did produce some data, the Amended Complaint does not allege that they produced *all* the information the Government seeks from Harvard. The allegations are even more revealing for the Department of Education, which is alleged only to be "investigating the admissions programs at many elite universities." Am. Compl. ¶ 68. It does not say that even *one* other school complied with any of its demands. *Id.* ¶ 69.

### III.    The Contract Claim Should Be Dismissed

The Government's contract claim (Count Two) derives purely from its Title VI claim and therefore fails for the same reasons. The contract claim does not ground Harvard's alleged obligations in any standalone language in a contract; the Government argues only that certain federal grant instruments signed by Harvard incorporate Title VI by reference. *See* Am. Compl. ¶¶ 78–83. Because the Government is not entitled to enforce its requests under Title VI, its contract claim likewise fails. *See Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985).

Regardless, the contract claim is unenforceable because the problems with the complaint are of a constitutional dimension. The standard for administrative subpoena enforcement derives from the Fourth Amendment. *See Sturm, Ruger*, 84 F.3d at 4. The Government has no more right to violate the First or Fourth Amendment through a contract claim than it does directly under Title VI. *See Harris Methodist*, 970 F.2d at 100 ("[A]ny consent found in the execution of the assurances of compliance [under Title VI] is consent only to searches that comport with constitutional standards of reasonableness."); *Guillemard-Ginorio v. Contreras-Gomez,* 585 F.3d 508, 527 (1st Cir.

2009) (the First Amendment prohibits retaliation even when the government may otherwise have a contractual right to take the retaliatory action).

**IV.    Alternatively, the Court Should Stay This Case Pending a Decision in *Massachusetts v. Department of Education***

If the Court does not dismiss this case in its entirety, it should stay this case pending a final decision in the IPEDS litigation. The data the Government seeks in the two cases overlap significantly. It is therefore no surprise that when the IPEDS door was blocked, the Government amended its complaint just 10 days later to add the Education Department investigation. A stay pending a decision in the IPEDS case would narrow the issues here and ensure the Education Department's demands do not run afoul of a sister court's injunction, which currently prohibits the Department from "bring[ing] any enforcement action, or otherwise penaliz[ing]" Harvard for failing to provide the revised IPEDS data. Doc No. 185 at 2, 26-cv-11229; *Mass. II*, 2026 WL 1114877, at \*5, 14.

"[F]ederal courts possess the inherent power to stay proceedings for prudential reasons." *Microfinancial, Inc. v. Premier Holidays Int'l Inc.*, 385 F.3d 72, 77 (1st Cir. 2004). Although courts in this Circuit consider various factors in deciding whether a stay is warranted, they generally focus on concerns about judicial economy and the balance of the equities. *See id.*; *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154–55 (1st Cir. 1992); *Good v. Altria Grp., Inc.*, 624 F. Supp. 2d 132, 134 (D. Me. 2009). Those considerations warrant a stay here.

To start, judicial economy supports a stay because the IPEDS litigation has significantly advanced. On May 19, the Government moved for a one-month remand without vacatur to allow it "to provide further explanation" for the requirements. Doc No. 196 at 6, *Massachusetts v. Dep't of Educ.*, 26-cv-11229 (D. Mass.). The Government requested that the court "retain jurisdiction … so the case can be efficiently resolved on the merits after the remand." *Id.* at 10. As a matter of judicial efficiency, knowing what if any additional information Harvard will produce through

IPEDS will inform whether any further information would be appropriate for the Government to obtain here, particularly since its purported purpose in seeking the IPEDS data is identical to that in this case.

The balance of the equities similarly favors a stay. There is no allegation that the data at issue is needed to protect against an imminent threat of discriminatory action. The agencies in this lawsuit "do[] not accuse Harvard of any discriminatory conduct." Am. Compl. at 2. And the Education Department has proclaimed that Harvard is "returning to admission based on merit," belying any purported need to obtain data right now. *See supra* p. 7–8 n.4. The University, by contrast, would suffer hardship by proceeding in multiple cases. The IPEDS court recognized that the heightened production requirements imposed by ACTS threatened irreparable harm because they forced universities to "restructur[e] their data-collection systems and divert[] resources from essential tasks." *Massachusetts v. Dep't of Educ. (Mass. I)*, 2026 WL 918941, at *17 (D. Mass. Apr. 3, 2026). The requests here are even more arduous because they seek decade-old documents at the applicant level. Harvard raised these burdens with the Education Department but received no substantive response other than this litigation. *See* Doc No. 27-19 at 5–6. Second, in enjoining the Government, Judge Saylor recognized that requiring universities to submit data on a "tight timeline" might lead them to "submit inconsistent and inaccurate data," thereby creating the risk of an unwarranted enforcement action. *Mass. I*, 2026 WL 918941, at *17.

For these reasons, if this case is not dismissed it should be stayed as a matter of judicial efficiency to allow Judge Saylor to determine in the first instance what data the Government is entitled to receive under IPEDS, and on what ground.

## **CONCLUSION**

The Court should dismiss the Amended Complaint or in the alternative stay the case pending final resolution of *Massachusetts v. Department of Education*.

20

June 3, 2026

Respectfully submitted,

PRESIDENT AND FELLOWS OF HAR-
VARD COLLEGE

By its attorneys,

/s/ Steven P. Lehotsky

Stuart F. Delery*
Helgi C. Walker*
Eric R. Womack*
Eric Brooks*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-4504
sdelery@gibsondunn.com
hwalker@gibsondunn.com
ewomack@gibsondunn.com
ebrooks2@gibsondunn.com

Joshua S. Levy (BBO #563017)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Joshua.Levy@ropesgray.com

Steven P. Lehotsky (BBO #655908)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com

Robert K. Hur*
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
rhur@kslaw.com

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 3, 2026, I caused this document to be filed through the CM/ECF system, where it will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>/s/ Steven P. Lehotsky</u>
Steven P. Lehotsky
