# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

United States of America,

          Plaintiff,

v.

President and Fellows of Harvard College,

          Defendant.

No. 1:26-cv-10844

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR A STAY PENDING FINAL RESOLUTION OF *MASSACHUSETTS V. DEPARTMENT OF EDUCATION***

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 2

    I.    Harvard Has a Recent History of Racially Discriminatory Admissions ............................ 2

    II.    The United States Investigates Universities' Compliance with Title VI ............................ 3

    III.    The United States Investigates Harvard's Compliance with Title VI ................................. 4

        A.    The Justice Department's Investigation .......................................................... 4

        B.    The Education Department's Investigation ..................................................... 5

LEGAL STANDARD ...................................................................................................... 6

ARGUMENT ................................................................................................................... 7

    I.    Title VI Requires Harvard to Produce Admissions Documents ......................................... 7

    II.    The United States Complied with the Procedural Prerequisites to this Lawsuit .............. 11

    III.    The United States Seeks the Data for a Proper Purpose ..................................................... 16

    IV.    The United States Has Stated a Claim for Breach of Contract ......................................... 18

    V.    The Court Should Not Stay This Case ............................................................................... 19

CONCLUSION ............................................................................................................... 20

CERTIFICATE OF SERVICE ....................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................ 6

*Berge v. Sch. Comm. of Gloucester*,
107 F.4th 33 (1st Cir. 2024) ..................................................................... 16, 17

*Blackstone Realty LLC v. FDIC*,
244 F.3d 193 (1st Cir. 2001) ........................................................................ 16

*Conservation Law Found. v. Exxon Mobil Corp.*,
3 F.4th 61 (1st Cir. 2021) ............................................................................. 20

*D.B. v. Esposito*,
675 F.3d 26 (1st Cir. 2012) ........................................................................... 17

*Dept. of Com. v. New York*,
588 U.S. 752 (2019) ...................................................................................... 15

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ...................................................................... 13

*González-Cabán v. JR Seafood, Inc.*,
48 F.4th 10 (1st Cir. 2022) ........................................................................... 10

*Hannah P. v. Coats*,
616 F.3d 327 (4th Cir. 2019) ........................................................................ 15

*HipSaver Co., Inc. v. J.T. Posey Co.*,
497 F. Supp. 2d 96 (D. Mass. 2007) ............................................................. 19

*Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*,
565 U.S. 171, 195 n.4 (2012) ........................................................................ 16

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*,
899 F.3d 1 (1st Cir. 2018) .............................................................................. 9

*Jones v. Bock*,
549 U.S. 199 (2007) ...................................................................................... 17

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016) ........................................................................................ 9

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) .......................................................................................... 9

*Marquis v. FDIC*,
  965 F.2d 1148 (1st Cir. 1992) ............................................................... 19

*Maryland v. King*,
  567 U.S. 1301 (2012) ............................................................................ 20

*Massachusetts v. Dep't of Educ.*,
  No. 26-cv-11229 (D. Mass. filed Mar. 11, 2026). ....................... 2, 19, 20

*MJ's Mkt., Inc. v. Jushi Holdings, Inc.*,
  766 F. Supp. 3d 197 (D. Mass. 2025) .................................................. 16

*Ocasio-Fernandez v. Fortuno-Burset*,
  640 F.3d 1 (1st Cir. 2011) ..................................................................... 6

*O'Brien v. Deutsche Bank Nat. Tr. Co.*,
  948 F.3d 31 (1st Cir. 2020) ................................................................... 6

*President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*,
  798 F. Supp. 3d 77 (D. Mass. 2025) ....................................... 16, 17, 18

*SEC v. Navellier & Assocs.*, Inc.,
  108 F.4th 19 (1st Cir. 2024) ................................................................. 17

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023) ...................................................................... *passim*

*United States v. Caceres*,
  440 U.S. 741 (1979) ............................................................................. 12

*United States v. President & Fellows of Harvard Coll.*,
  No. 26-cv-11352 (D. Mass. filed Mar. 20, 2026) ................................ 17

*United States v. Tivian Labs., Inc.*,
  589 F.2d 49 (1st Cir. 1978) .................................................................. 19

*Wilkinson v. Legal Servs. Corp.*,
  27 F. Supp. 2d 32 (D.D.C. 1998) ......................................................... 14

**Statutes**

42 U.S.C. § 2000d-1 ................................................................... 3, 11, 12

**Rules**

Fed. R. Civ. P. 12 ................................................................................. 16

**Regulations**

28 C.F.R. § 42.104 ................................................................................. 7
28 C.F.R. § 42.105 ................................................................................. 7

28 C.F.R. § 42.106 ............................................................................................ 7, 9, 11, 14

28 C.F.R. § 42.107 ...................................................................................................... 3, 8

28 C.F.R. § 42.108 ......................................................................................................... 12

28 C.F.R. § 50.3 ............................................................................................................. 12

34 C.F.R. § 99.31 ........................................................................................................... 10

34 C.F.R. § 100.3 ............................................................................................................. 8

34 C.F.R. § 100.4 ............................................................................................................. 8

34 C.F.R. § 100.6 ................................................................................................. 1, 8, 9, 13

34 C.F.R. § 100.7 .......................................................................................................... 3, 8

34 C.F.R. § 100.8 ..................................................................................................... 13, 14

Executive Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ..................................... 3

## Other Authorities

Tunku Varadarajan, *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*,
   Wall Street Journal (Mar. 27, 2026), https://tinyurl.com/4r7puzht.........................................17

**INTRODUCTION**

This lawsuit is about access to data. In 2023, the Supreme Court held that Defendant President and Fellows of Harvard College ("Harvard") violated Title VI by considering race in its admissions process. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("*SFFA*"). Less than two years later, the United States began investigating Harvard to ensure that it has stopped discriminating. The Amended Complaint ("Complaint") adequately alleges that Harvard has refused to comply with this investigation and has rebuffed the United States' repeated requests for its admissions data and documents. The United States has an undisputed right to obtain these data and documents. The Justice Department and Education Department's regulations, to which Harvard agreed when contracting with the United States, state that Harvard "shall" provide access to relevant documents at the request of the United States. 34 C.F.R. § 100.6(b). Each Department followed the proper procedures to obtain these documents to which they plainly are entitled. That alone warrants denial of Harvard's motion to dismiss.

Harvard seeks to transform this straightforward data-access lawsuit into something that it is not: a First Amendment battle. It insists that this lawsuit is part of a broader governmental conspiracy to retaliate against Harvard for exercising its First Amendment rights. Harvard's argument rests on two phantasmagorical premises: (1) the United States' investigations of Harvard have nothing to do with *SFFA*—there is no legitimate reason why the United States would want to investigate a university that the Supreme Court recently held was racially discriminating, and (2) this lawsuit has nothing to do with Harvard's refusal to produce documents, in flagrant violation of Title VI's regulations and in breach of its own contracts—there is no legitimate reason

1

why the United States would want to enforce Title VI against a recipient of billions of dollars of federal funding with a recent history of racial discrimination.

Harvard is not special. Every single recipient of federal funding must comply with Title VI. This includes allowing the United States to access documents necessary to ascertain the recipient's compliance with Title VI. As the Complaint alleges, the United States is investigating dozens of other colleges, medical schools, and law schools for compliance with Title VI and *SFFA*, and nearly all of these recipients have produced or pledged to produce their admissions data. Harvard refused, so Harvard got sued. That is not retaliation.

Additionally, the Court should reject Harvard's alternative request to stay this case pending final judgment in *Massachusetts v. Department of Education*, No. 26-cv-11229 (D. Mass. filed Mar. 11, 2026). That case raises unrelated legal questions under the Administrative Procedure Act, the adjudication of which will not affect Harvard's obligations or the United States' rights under Title VI.

## BACKGROUND

### I.     Harvard Has a Recent History of Racially Discriminatory Admissions

Less than two years before this investigation began, the Supreme Court held that Harvard violated Title VI by considering race in its undergraduate admissions process. Harvard's "race-based admissions system[]" defied the "twin commands of the Equal Protection Clause," and therefore Title VI, "that race may never be used as a 'negative' and that it may not operate as a stereotype." *SFFA*, 600 U.S. at 218; *see also id.* at 198 n.2 ("[D]iscrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI."). "College admissions are zero-sum," and race was "determinative for at least some—if not many—of the students [Harvard] admit[ted]." *Id.* at 218–219. The "point of [Harvard's] admissions programs [was] that there is an inherent

basis of race *qua* race—in race for race's sake … Harvard's admissions process rests on the pernicious stereotype that a black student can usually bring something that a white person cannot offer." *Id.* at 220 (quotation marks omitted).  Further, Harvard's admissions process "lack[ed] a logical end point."  *Id.* at 221 (quotation marks omitted).  Harvard maintained a "numerical commitment" to "patently unconstitutional" "[o]utright racial balancing."  *Id.* at 222–223.  "For the admitted classes of 2009 to 2018, black students represented a tight band of 10.0%–11.7% of the admitted pool.  The same theme held true for other minority groups."  *Id.* at 222.

## II.    The United States Investigates Universities' Compliance with Title VI

Title VI instructs "[e]ach Federal department and agency which is empowered to extend Federal financial assistance … to effectuate the provisions of [Title VI] … by issuing rules, regulations, or orders."  42 U.S.C. § 2000d-1.  Pursuant to this congressional directive, both the Justice and Education Departments promulgated regulations directing officials to "from time to time review the practices of recipients to determine whether they are complying with" Title VI and its implementing regulations.  28 C.F.R. § 42.107(a) (Justice); 34 C.F.R. § 100.7(a) (Education).

Immediately after taking office, President Trump signed Executive Order 14173, entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity.*  90 Fed. Reg. 8633 (Jan. 21, 2025).  The Order instructs "all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities," such as affirmative action in college admissions.  *Id.* § 2.  In accordance with its own regulations and Executive Order 14173, the Justice Department "initiated compliance reviews of over eighty undergraduate programs, medical schools, and law schools across the country, including many of Harvard's peers."  Compl. ¶ 68.  The purpose of each investigation is to assess "admissions policies and compliance with the Supreme Court's decision in Students for Fair Admissions."  *Id.* (quoting Ex. C at 1).  "Nearly all of the elite universities under investigation have complied with Title VI"

by cooperating with the Justice Department's investigations. *Id.* ¶ 69. With the sole exception of Harvard, every single university under investigation has either entered into settlements or "produced or pledged to produce" (i.e., productions are in progress or forthcoming) requested "applicant-level admissions data to the Department of Justice." *Id.*[1]

**III.    The United States Investigates Harvard's Compliance with Title VI**

   *A.     The Justice Department's Investigation*

Harvard is a recipient of funding from the Justice Department. Compl. ¶ 14. In light of *SFFA*, the Justice Department "opened an investigation of Harvard's compliance with Title VI" in April 2025. *Id.* ¶ 25. The Justice Department asked Harvard College to produce "any and all relevant documents guiding your admissions policies and procedures" and "all admissions data for the past five academic years, including applicant test scores (SAT/ACT), GPA, extracurricular activities, essays, and admission outcomes, disaggregated by race and ethnicity." *Id.* ¶ 26. The Justice Department made similar requests to Harvard Law School and Harvard Medical School. *Id.* ¶¶ 27–28. "The Justice Department needs [this] applicant-level data to determine whether Harvard is complying with Title VI and the Supreme Court's ruling in SFFA." *Id.* ¶ 29.

Harvard did not produce the requested data. Compl. ¶¶ 32–34. In September 2025, the Justice Department therefore informed Harvard that its productions were deficient. *Id.* ¶¶ 35–36. The Justice Department requested that Harvard produce a "searchable electronic spreadsheet containing individual-level data." *Id.* ¶ 36 (quotation marks omitted); *see also id.* ¶ 37; Ex. G. at

---

[1] At the time the Complaint was filed, every university except for Harvard and one other university had produced or pledged to produce requested admissions data. The Justice Department was continuing to negotiate with the other university, which since has pledged to produce the data. Additionally, the Justice Department recently opened fifteen additional investigations of medical schools, bringing the total to approximately one hundred. Dep't of Justice Office of Public Affairs, *Justice Department Expands Admissions Investigations into 15 Additional Medical Schools* (June 4, 2026), https://tinyurl.com/3dkwaavt. The deadline for production for the fifteen newly investigated medical schools has not yet passed.

3–5; Ex. H at 3–5.  It instructed Harvard to produce "the requested information … to avoid the need for enforcement action."  Ex. G at 3; Ex. H at 2.  The Justice Department set deadlines of September 29, 2025, for Harvard Medical School and October 6, 2025, for Harvard College.  Ex. G at 2; Ex. H at 2.  Harvard and the Justice Department later "agreed to one final extension of the deadline for production … until October 10," 2025.  Compl. ¶ 39.  "The Department of Justice stated that it would not 'agree[] to any further extensions' and warned Harvard that failure to produce 'all of the requested data by October 10th' would be viewed as a failure 'to cooperate with the United States' compliance review.'"  *Id.* (quoting Ex. I at 1.).  Defying the final deadline, "Harvard did not produce the requested data by October 10, 2025."  *Id.* ¶ 41.

B.      *The Education Department's Investigation*

"Harvard participates in several student financial assistance programs administered by the Department of Education."  *Id.* ¶ 43.  "When applying to participate in these programs," Harvard "agreed to 'comply with … Title VI of the Civil Rights Act of 1964, as amended, and the implementing regulations.'" *Id.* ¶ 44 (quoting Ex. K at 2).  In May 2025, the Education Department "opened an investigation of Harvard's compliance with Title VI."  *Id.* ¶ 53.

The Education Department "requested applicant-level admissions data from Harvard."  *Id.* ¶ 56.  The Education Department requested "*individualized*, anonymized data for each applicant, admitted student, and enrolled student in spreadsheet format for each application season since January 1, 2016, including the following information: '[t]he race of each student,' '[e]ach student's standardized test scores,' and '[e]ach student's GPA.'"  *Id.* (quoting Ex. M at 6).

"Harvard failed to produce many of the documents requested by the Department of Education."  Compl. ¶ 58.  Its productions "did not include applicant-level admissions data or documents."  *Id.*  On September 19, 2025, the Education Department "sent Harvard a letter entitled 'Denial of Access.'"  *Id.* ¶ 61.  The letter announced the Department's conclusion that "Harvard

has refused to provide the requested information necessary for OCR to make a compliance determination." *Id.* (quoting Ex. Q at 2). The letter added that "[i]f Harvard does not voluntarily provide OCR with access to the requested information and materials **within 20 calendar days of this letter**, OCR will issue a Letter of Impending Enforcement Action to initiate the OCR's enforcement action process." Compl. ¶ 61 (quoting Ex. Q at 2) (emphasis in original).

On March 23, 2026, after the United States had filed this lawsuit, the Education Department sent Harvard a "Letter of Impending Enforcement Action." Compl. ¶ 62. The letter threatened that because of Harvard's "failure to provide access to the requested evidence, [the Education Department] will either (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance … or (2) refer the case to Department of Justice for judicial proceedings to enforce any rights of the United States under any law of the United States." *Id.* (quoting Ex. R at 2). Harvard did not produce the requested data, so the Education Department referred this case to the Justice Department. *Id.* ¶¶ 63, 65.

**LEGAL STANDARD**

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Fernandez v. Fortuno-Burset*, 640 F.3d 1, 7 (1st Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation marks omitted). A court must "draw the operative facts primarily from the complaint" but "may also incorporate facts from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *O'Brien v. Deutsche Bank Nat. Tr. Co.*, 948 F.3d 31, 33 (1st Cir. 2020) (quotation marks omitted).

**ARGUMENT**

**I.    Title VI Requires Harvard to Produce Admissions Documents**

The United States has stated a Title VI claim because Harvard has failed to produce data and documents that Title VI and its implementing regulations unambiguously require Harvard to produce.  When contracting with the Justice Department, Harvard agreed that it would "'comply with all applicable requirements of 28 C.F.R. Part 42,' which includes the Department of Justice's regulations implementing Title VI."  Compl. ¶ 17 (quoting Ex. A at 13).  Those regulations require "[e]very application for Federal financial assistance" to "contain or be accompanied by an assurance that the program will be conducted … in compliance with all requirements imposed by or pursuant to this subpart [Subpart C]."  28 C.F.R. § 42.105(a)(1).  Subpart C prohibits race discrimination and "[s]pecific discriminatory actions," including "[t]reat[ing] an individual differently from others in determining whether he satisfies any admission … condition which individuals must meet" and "[d]eny[ing] an individual an opportunity to participate in the program."  *Id.* § 42.104(b); *see also* Compl. ¶¶ 18, 20.

To ensure that federally funded programs are complying with these antidiscrimination provisions, Subpart C provides that recipients of federal funding such as Harvard "shall … submit to the responsible Department official … timely, complete, and accurate compliance reports at such times, and in such form and containing such information, as the responsible Department official or his designee may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this subpart."  28 C.F.R. § 42.106(b).  Recipients also "shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities, as may be pertinent to ascertain compliance with this subpart."  *Id.* § 42.106(c).  Stated differently, the Justice Department has the right to "review the practices of recipients to determine whether

7

they are complying with" Title VI and its implementing regulations. *Id.* § 42.107(a); *see also* Compl. ¶¶ 21–23.

The Education Department has materially identical regulations. When applying to participate in student financial assistance programs, Harvard agreed to "comply with … Title VI of the Civil Rights Act of 1964, as amended, and the implementing regulations, 34 C.F.R. Parts 100 and 101." Compl. ¶ 44 (quoting Ex. K at 2). Part 100, like the Justice Department's regulations, requires "[e]very application for Federal financial assistance" to "contain or be accompanied by an assurance that the program will be conducted … in compliance with all requirements imposed by or pursuant to this part [Part 100]." 34 C.F.R. § 100.4(a)(1); *see also* Compl. ¶ 46. Part 100 contains antidiscrimination provisions identical to those in the Justice Department Regulations. *See id.* § 100.3; *see also* Compl. ¶¶ 47–48.

Part 100 also contains provisions designed to allow the United States to audit recipients' practices to ensure they are complying with Title VI. Part 100 provides that recipients "shall … submit to the responsible Department official … timely, complete and accurate compliance reports at such times, and in such form and containing such information, as the responsible Department official … may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this part." 34 C.F.R. § 100.6(b). Recipients "shall permit access by the responsible Department official … during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part." *Id.* § 100.6(c). The Education Department also has the right to "review the practices of recipients to determine whether they are complying with this part." *Id.* § 100.7(a); *see also* Compl. ¶¶ 49–51.

Both the Justice Department and the Education Department's regulations require Harvard to produce the requested admissions documents and data to the United States. The regulations use "mandatory, 'shall' language." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 899 F.3d 1, 11–12 (1st Cir. 2018). The "word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (The "mandatory 'shall' … normally creates an obligation impervious to ... discretion"). Recipients of federal funding "*shall* … submit … compliance reports." 28 C.F.R. § 42.106(b); 34 C.F.R. § 100.6(b) (emphasis added). They also "*shall* permit access … to such of [their] books, records, accounts, and other sources of information, and [their] facilities as may be pertinent to ascertain compliance" with Title VI. 28 C.F.R § 42.106(c); 34 C.F.R. § 100.6(c) (emphasis added). Harvard therefore has a nondiscretionary and non-negotiable obligation to produce any documents that "the responsible Department official … may determine to be necessary to enable him to ascertain whether [Harvard] has complied or is complying with" Title VI. 28 C.F.R. § 42.106(b); 34 C.F.R § 100.6(b).

Harvard barely disputes that the data sought by the United States are "necessary" or "pertinent to ascertain compliance" with Title VI. Its assertion that the United States' requests are "not relevant" is hard to take seriously. Mot. 12. The data sought by the United States are similar to the evidence of Harvard's discrimination presented by the plaintiffs in *SFFA*. As *SFFA* illustrates, quantitative data regarding the racial composition of Harvard's applicant pool and student body can be proof of an illegal "numerical commitment" to "[o]utright racial balancing." *SFFA*, 600 U.S. at 222–223. The requested data regarding applicants' academic performance similarly can show discrimination. *Id.* at 197 n.1; *see* Compl. ¶¶ 26–28, 56 (detailing requests for

applicants' GPAs and test scores).  So can applicants' personal ratings.  *SFFA*, 600 U.S. at 295 (Gorsuch, J., concurring); *see* Compl. ¶¶ 36–37 (detailing requests for personal ratings).

Harvard seems to argue that recipients of federal funding do not need to comply with Title VI document-access regulations as long as the recipients are not discriminating.  "As the Government is aware," it argues, "Harvard changed its admissions policies," and the Education Department "issued a press release stating that Harvard … had 'seen substantial shifts in [its] admissions for the class of 2029' following *SFFA*.'"  Mot. 2, 7–8 (capitalization altered).  That Harvard claims to have made *some* progress to comply with Title VI's provisions does not mean that Harvard is in fact complying with Title VI.  Any progress could be insufficient, or Harvard could be exaggerating; courts owe no deference to a university that says, "trust us."  *SFFA*, 600 U.S. at 217.  Moreover, any compliance with Title VI's antidiscrimination provisions does not guarantee compliance with separate regulatory document-access provisions.  Recipients of federal funding violate these regulations when they wrongfully withhold documents from the United States, even if the recipients are not discriminating on the ground of race.

Harvard also suggests that the United States may not "demand[] sensitive, identifiable records … including personal essays and life histories (some of which include sensitive medical information)."  Mot. 1.  Harvard's "perfunctory" references to these records are "unaccompanied by some effort at developed argumentation," so Harvard has waived the argument that these records need not be disclosed due to sensitivity.  *González-Cabán v. JR Seafood, Inc.*, 48 F.4th 10, 18 (1st Cir. 2022).  Still, the argument lacks merit.  The Title VI regulations lack exceptions for "sensitive" documents, the United States has requested *anonymized* data, Compl. ¶ 56, and educational institutions "may disclose personally identifiable information from an education record" to the Attorney General and the Secretary of Education.  34 C.F.R. § 99.31(a), (a)(3).

Lastly, Harvard's repeated and dubious objections that the United States' requests are "overbroad" or "unduly burdensome" as a whole have no bearing on whether the United States has a right to obtain any particular documents. Mot. 1, 6–7, 20. Dozens of other programs have produced substantially similar requested data, belying any objection that Harvard cannot do so as well. Compl. ¶ 69. Harvard also should have much of the requested data at the ready: "In general, recipients should have available for the Department racial and ethnic data showing the extent to which members of minority groups are beneficiaries of federally assisted programs." 28 C.F.R. § 42.106(b). In any event, if the Court holds that Harvard has violated Title VI and breached its contracts by refusing to produce documents and data, then the scope of relief can be addressed in subsequent briefing and negotiations. The United States remains willing to negotiate the breadth of its requests for documents provided that Harvard complies with Title VI and produces applicant-level data adequate for the United States to conduct a meaningful compliance review.

## II.     The United States Complied with the Procedural Prerequisites to this Lawsuit

Federal law imposes minimal procedural obligations that the United States must satisfy before bringing a Title VI action that does not seek the revocation of funding. The United States must "determine[] that compliance cannot be secured by voluntary means" and "advise[]" the defendant "of the failure to comply" with Title VI. 42 U.S.C. § 2000d-1. The Justice Department and Education Department also must comply with additional and separate regulatory provisions.

**1.** The Complaint alleges that the Justice Department followed all mandatory procedural steps. After several extensions and following verbal negotiations with Harvard's counsel, the Department (again) extended the final deadline for document production, indicated that it would not "agree[] to any further extensions," and (again) informed Harvard that failure to produce the requested documents will be viewed as noncooperation. Ex. I at 1; *see also* Compl. ¶ 39. Harvard

missed this deadline, so the Department concluded that Harvard would not voluntarily comply with Title VI. Harvard's counterarguments lack merit.

First, Harvard argues that the Justice Department failed to make a "concerted effort … to persuade any noncomplying applicant or recipient voluntarily to comply with Title VI." 28 C.F.R. § 50.3. The Justice Department is not required to make such an effort. Harvard relies on a regulation "intended to provide procedural *guidance* to … agency officials in exercising their statutory discretion." *Id.* § 50.3(c) (emphasis added). *See United States v. Caceres*, 440 U.S. 741, 754 n.18 (1979) ("[A]gencies are not required, at the risk of invalidation of their action, to follow all of their rules, even those properly classified as 'internal.'"). The Justice Department nevertheless made the requisite concerted effort to secure Harvard's voluntary compliance by repeatedly extending deadlines and giving Harvard "months to gather the data." Ex. I at 1. That is all Title VI requires. The Justice Department was not obligated to narrow or otherwise revise its document requests at Harvard's demand. Nor was the Justice Department obligated to "reengage[]" with Harvard after the already extended October 10, 2025, deadline passed. Mot. 14.

Second, Harvard claims a "responsible Department official" did not "determine[] that compliance cannot be secured by voluntary means." 28 C.F.R. § 42.108(d)(1); *see* Mot. 14. The Assistant Attorney General affixed her name to the Complaint, reflecting her determination that Harvard "fail[ed] to cooperate" with the Justice Department. *See* Compl. at 6–11, 22.

Third, Harvard falsely insists that the "Justice Department never 'advised [Harvard] of the failure to comply' with the information requests and 'the action to be taken to effect compliance.'" Mot. 14 (quoting 42 U.S.C. § 2000d-1; 28 C.F.R. § 42.108(d)(3)). The United States informed Harvard that "if [it] does not provide the United States with all of the requested data by October 10th, we *will* conclude that your client does not wish to cooperate with the United States'

12

compliance review." Ex. I at 1 (emphasis added). According to Harvard, this "conditional forward-looking statement … cannot constitute the required notice," Mot. 15, but "in many cases[,] [an] agency's pre-enforcement efforts to bring about compliance will provide adequate notice." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). The Justice Department also plainly advised Harvard of "the action to be taken to effect compliance" because it explained that the "United States may pursue legal action to compel [Harvard] to provide the requested information." Ex. H at 2; Ex. G at 2. True to its word, the United States pursued legal action.

**2.** The Complaint also alleges that the Education Department complied with all procedural requirements. The Department twice warned Harvard that failure to "voluntarily provide … access to the requested information" would "initiate the [Department's] enforcement action process." Ex. Q at 2; *see also* Ex. R at 3; Compl. ¶¶ 61–62. The Department could not have been clearer: "Based on [Harvard's] 'failure to provide access to the requested evidence,'" the Department will either revoke funding or "refer the case to DOJ for judicial proceedings to enforce any rights of the United States under any law of the United States." Compl. ¶ 62 (quoting Ex. R at 3).

According to Harvard, the Education Department failed to comply with a regulation requiring the Department to wait "at least 10 days from the mailing of such notice [of noncompliance]" before commencing an enforcing action and to make "additional efforts … to persuade the recipient … to comply with the regulation" during that ten-day period. Mot. 16; 34 C.F.R. § 100.8(d)(3). That is untrue. On September 19, 2025, the Department informed Harvard in a "Denial of Access" letter that failure to "voluntarily provide" the requested documents "will constitute a violation of 34 C.F.R. § 100.6(b)." Ex. Q at 2; Compl. ¶ 61. This Denial of Access letter was a notice of noncompliance. Ex. Q at 2 ("Harvard has refused to provide the requested information."). On March 23, 2026—far more than ten days later—the Department

13

again informed Harvard via a "Letter of Pending Enforcement Action" that Harvard failed to provide the documents. *Id.* ¶ 62 (citing Ex. Q). This letter was the Department's final attempt to "persuade [Harvard] to comply" with Title VI and therefore satisfies 34 C.F.R. § 100.8(d)(3).[2]

The Education Department also complied with 34 C.F.R. § 100.8(d)(2), which requires it to notify Harvard "of the action to be taken to effect compliance." The Education Department warned Harvard that it would "refer the case to Department of Justice for judicial proceedings." Compl. ¶ 62 (quoting Ex. R at 2). Harvard protests that this notification did not come ten days after the Letter of Pending Enforcement Action, but subsection (d)(2), unlike subsection (d)(3), lacks a ten-day timing requirement. The Education Department may inform Harvard of the action to be taken at any time before an "action to effect compliance." 34 C.F.R. § 100.8(d).

**3.** Unable to demonstrate a violation of existing procedural requirements, Harvard resorts to inventing new ones. It accuses the Justice Department of failing to "establish the reasons the documents Harvard already produced are insufficient." Mot. 14. Title VI and its regulations do not require the United States to explain its reasoning when requesting access to "sources of information … as may be pertinent to ascertain compliance" with Title VI. 28 C.F.R. § 42.106(c). And it is obvious why Harvard's productions are insufficient: they lack the applicant-level data necessary to prove compliance or noncompliance with Title VI. Compl. ¶ 29; *see also SFFA*, 600 U.S. at 197 n.1. Harvard feigns obliviousness and pretends that it has no idea why the United

---

[2] Harvard's motion is unclear as to which letter supposedly triggers the ten-day negotiation requirement. If the Letter of Impending Enforcement Action is the relevant letter, the United States was not required to engage in post-letter negotiations with Harvard because negotiations would have been futile given that the Justice Department already had sued Harvard by the time the Education Department sent the letter. *See Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 63 (D.D.C. 1998) ("[W]hen a procedural violation is deemed immaterial or harmless, a court will not require an agency to engage in the empty exercise of repeating a procedure according to rules where the result of the procedure is foreordained.").

States wants its admissions data, but it should not be allowed to shirk its Title VI obligations by "exhibit[ing] a naiveté from which ordinary citizens are free." Mot. 17 (quoting *Dept. of Com. v. New York*, 588 U.S. 752, 785 (2019)). Likewise, although Harvard asserts that the Education Department failed to provide a "reason why Harvard had been selected for a review," Mot. 5, the obvious reason is *SFFA*, *supra* 2–4, and there is no statutory or regulatory requirement that the Education Department inform funding recipients why they are selected for review.

Harvard also seeks dismissal because the Justice Department did not determine "that the parties had reached an impasse on the documents." Mot. 13. Again, the Justice Department explained in no uncertain terms that failure to provide the requested data by October 10, 2025, would be viewed as a failure to cooperate with Title VI. Harvard refused to produce the data and offered no explanation for its obstinance. That is the epitome of an impasse. As Harvard observes, the purpose of Title VI's notice requirement is to ensure that "the agency and funding recipient can work together to address the Government's information requests." Mot. 15. Harvard had every opportunity to do so and was aware of the possibility of an "aggressive enforcement action," *id.*, even though the Justice Department never used the magic word "impasse" to describe the parties' manifestly irreconcilable positions. *Cf. Hannah P. v. Coats*, 616 F.3d 327, 345 (4th Cir. 2019) ("Proper notice does not require 'any magic words.'").

Nor does it matter that the United States "do[es] not accuse Harvard of any discriminatory conduct." Mot. 18 (quotation marks omitted). The United States does not accuse Harvard of any discriminatory conduct because Harvard illegally has withheld the evidence necessary to make such an accusation. The Title VI regulations sensibly do not require the United States to provide evidence of discrimination before requesting access to evidence of discrimination.

### III. The United States Seeks the Data for a Proper Purpose

Harvard seeks dismissal based on its speculation that this litigation is part of a supposed "retaliatory campaign against Harvard." Mot. 16. Its argument fails for two independent reasons. First, the United States has alleged that the purpose of its investigations is to ensure that an institution that the Supreme Court held "recently has discriminated on the basis of race" has stopped discriminating. Compl. ¶ 13. The stated purpose of the Justice Department's investigations is to assess "admissions policies and compliance with the Supreme Court's decision in *Students for Fair Admissions*." *Id.* ¶ 68 (quoting Ex. C at 1). The Education Department likewise explained that its investigation "will examine whether Harvard discriminates against applicants and potential applicants on the basis of race." Compl. ¶ 54 (quoting Ex. L at 1). The Court must accept these allegations as true at the motion-to-dismiss stage.

Second, Harvard's retaliation argument is an affirmative defense, and Harvard cannot meet its heavy burden of proof. The First Amendment can "operate[] as an affirmative defense to an otherwise cognizable claim." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 195 n.4 (2012); *see also MJ's Mkt., Inc. v. Jushi Holdings, Inc.*, 766 F. Supp. 3d 197, 213 (D. Mass. 2025) ("The *Noerr-Pennington* doctrine functions as an affirmative defense."). "[F]or dismissal to be allowed on the basis of an affirmative defense … review of the complaint, together with any other documents appropriately considered under Fed. R. Civ. P. 12(b)(6), must leave no doubt that the plaintiff's action is barred by the asserted defense." *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001) (quotation marks omitted).

To succeed on its retaliation defense at this stage, Harvard must show that there is *no doubt* that its "protected conduct played 'a substantial or motivating' part" in the United States' decision to investigate Harvard and bring this lawsuit. *President & Fellows of Harvard Coll. v. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 118 (D. Mass. 2025) ("*HHS*") (quoting *Berge v. Sch.*

16

*Comm. of Gloucester*, 107 F.4th 33, 37 n.4 (1st Cir. 2024)).  Harvard does not have the evidence necessary to satisfy this stringent standard.  President Trump's statement that Harvard "needed to pay $500 million because it had been 'very bad,'" Mot. 4, 17, is unrelated to this case, in which "the United States does not … seek monetary damages or the revocation of federal funding." Compl. at 2.  And Assistant Attorney General Dhillon's statement references a separate, unrelated case against Harvard.  Mot. 2, 17.[3]

Harvard also claims that of the nearly one hundred university programs under investigation, "only Harvard has been sued over document requests."  Mot. 17–18.  Harvard speculates that other universities "*presumably*" have refused to cooperate with the Justice Department, Mot. 18 (emphasis added), but it lacks actual evidence that it is "similarly situated to the comparators [it] identif[ies]," *i.e.*, evidence that other universities refused to provide admissions data to the United States.  *SEC v. Navellier & Assocs., Inc.*, 108 F.4th 19, 40 (1st Cir. 2024).  And while the Complaint does not allege that other schools have complied with the Education Department's investigations, the United States need not anticipate and negate affirmative defenses.  *See Jones v. Bock*, 549 U.S. 199, 215 (2007).

Even if Harvard had evidence of retaliation, the United States could overcome Harvard's defense "by showing that '[it] would have reached the same decision . . . even in the absence of the protected conduct.'"  *HHS*, 798 F. Supp. 3d at 118 (quoting *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012)).  When viewed in the light most favorable to the United States, the Complaint establishes that (1) the United States is committed to ensuring that universities are complying with Title VI and *SFFA*, Compl. ¶ 66; (2) the United States is investigating selective universities,

---

[3] *See* Tunku Varadarajan, *Harmeet Dhillon, Trump's Civil-Rights Enforcer in Action*, Wall Street Journal (Mar. 27, 2026), https://tinyurl.com/4r7puzht (citing *United States v. President & Fellows of Harvard Coll.*, No. 26-cv-11352 (D. Mass. filed Mar. 20, 2026)).

including those that admitted in *SFFA* briefs that they considered race in admissions, *id.* ¶ 67; and (3) that Harvard refused to cooperate with the Justice Department and Education Department's investigations, *id.* ¶¶ 39, 62. The logical inferences from these allegations are that the United States is investigating Harvard because Harvard admitted to considering race in admissions just two years before the investigations began and sued Harvard for failure to comply with its investigations—not because of Harvard's "exercise of First Amendment rights." Mot. 17. The Court therefore should reject Harvard's retaliation defense at this stage. A contrary holding would produce the absurd result that the United States may investigate any university's compliance with Title VI, except for the very university that the Supreme Court recently held was violating Title VI.

Finally, *HHS* does not require dismissal of this case. In *HHS*, Judge Burroughs held that the United States violated the First Amendment by terminating grants in retaliation for Harvard's viewpoints on "governance, hiring, and academic programs." 798 F. Supp. 3d at 119; *see also* Mot. 8. The United States respectfully disagrees with this decision, and its appeal is pending before the First Circuit (No. 25-2230). In any case, *HHS* is not a get-out-of-jail-free card that allows Harvard to violate federal law with impunity by asserting retaliation. As Judge Burroughs noted and as Harvard did not dispute in *HHS*, the United States has the "constitutional, statutory, [and] regulatory authority" to bring Title VI claims against Harvard as long as the United States follows the procedural "requirements of Title VI." *HHS*, 798 F. Supp. 3d at 136. The United States has done so here. *Supra* 11–14.

## IV. The United States Has Stated a Claim for Breach of Contract

Harvard does not contest that it signed legally binding contracts, that these contracts require it to comply with regulations guaranteeing that the United States may access documents necessary to ascertain Harvard's compliance with Title VI, or that these guarantees are material terms. Compl. ¶¶ 15, 44. By undisputedly failing to provide access to these documents, Harvard has

breached its contracts, so the Court should order specific performance. *See HipSaver Co., Inc. v. J.T. Posey Co.*, 497 F. Supp. 2d 96, 109 (D. Mass. 2007) (holding that injunctive relief is the appropriate remedy where a plaintiff does not suffer monetary damages).

Harvard retorts that "the contract claim is unenforceable because the problems with the complaint are of a constitutional dimension" because the United States is violating the First and Fourth Amendments. Mot. 18. As discussed above, this lawsuit does not violate Harvard's First Amendment rights. *Supra* 16–18. Nor does it violate Harvard's Fourth Amendment rights because as relevant here, the Fourth Amendment requires nothing more than "a showing by the agency … that its investigation is authorized by Congress and is for a purpose Congress can order." *United States v. Tivian Labs., Inc.*, 589 F.2d 49, 54 (1st Cir. 1978). The United States plausibly has alleged that the purpose of its investigations is to ensure Harvard has stopped discriminating, *supra* 2–4, and Congress has the power to audit recipients of federal funding.

## V. The Court Should Not Stay This Case

As an alternative to dismissal, Harvard requests a stay pending a decision in *Massachusetts*. "[S]tays cannot be cavalierly dispensed: there must be good cause for their issuance," *Marquis v. FDIC*, 965 F.2d 1148, 1155 (1st Cir. 1992), and there is no good reason to stay this case.

A stay will not promote judicial economy. *Contra* Mot. 19–20. In *Massachusetts*, the United States filed an opposed motion to remand to the Education Department "to permit the Department to provide further explanation" for the expansion of the Integrated Postsecondary Education Data System ("IPEDS"). *Massachusetts*, Dkt. 196 at 4. Whether Harvard must produce data through IPEDS has no bearing on the entirely separate questions whether Harvard must produce data pursuant to Title VI and its contractual obligations—questions that the Court must confront regardless of the outcome in *Massachusetts*. Harvard hints that judicial economy supports a stay because if (1) the opposed motion to remand is granted, (2) the Education

19

Department provides adequate explanation, (3) the court subsequently upholds the IPEDS expansion, (4) Harvard cooperates with the expansion and produces data, and (5) the data cover all of the United States' requests at issue here, then this case might partly become moot insofar as Harvard will have produced the data sought by the United States. Such "wholly speculative" wait-and-see concerns about mootness do not justify a possibly yearslong stay. *Conservation Law Found. v. Exxon Mobil Corp.*, 3 F.4th 61, 73–74 (1st Cir. 2021). Also, even if the United States' data requests are mooted, its document requests remain ripe.

The balance of the equities also counsels against a stay. Harvard would not "suffer hardship" in the absence of a stay "by proceeding in multiple cases." Mot. 20. Harvard is not a party in *Massachusetts*, and any overlaps in the data it must produce in response to IPEDS and the Title VI requests would reduce any burden on Harvard, not increase it. Harvard complains that "requiring universities to submit data on a tight time-line might lead [it] to submit inconsistent and inaccurate data," Mot. 20 (quotation marks omitted), but Harvard has had more than a year to produce data to the United States—ample time to ensure its productions are accurate. Compl. ¶¶ 25, 53. In contrast, a stay would prejudice the United States by further prolonging its inability to enforce Title VI. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). The United States' efforts to ensure that Harvard has stopped discriminating on the ground of race should not be consigned to purgatory while the Education Department litigates the contours of an unrelated rulemaking.

## CONCLUSION

The Court should not stay this case pending a final judgment in *Massachusetts*, and Harvard's motion to dismiss should be denied.

DATED: June 17, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JESUS A. OSETE
Principal Deputy Assistant Attorney General

JEFFREY MORRISON (MO No. 44401)
Deputy Assistant Attorney General


*/s/ Joshua R. Zuckerman*
RACHEL A. JANKOWSKI (DC No. 1686346)
BRIAN L. REPPER (DC No. 90028256)
Deputy Chiefs
JOSHUA R. ZUCKERMAN (DC No. 1724555)
Attorney
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530
Telephone: (202) 514-3847
Email: joshua.zuckerman@usdoj.gov

**CERTIFICATE OF SERVICE**

I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will distribute copies of the foregoing to the following counsel of record for Defendant on this, the 17th day of June, 2026.

Helgi C. Walker
Stuart F. Delery
Eric R. Womack
Eric Brooks
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
T: (202) 887-3599
F: (202) 530-9595
hwalker@gibsondunn.com

Steven P. Lehotsky
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW, Suite 700
Washington, DC 20001
T: (512) 693-8350
F: (512) 727-4755
steve@lkcfirm.com

Joshua S. Levy
ROPES & GRAY LLP
The Prudential Tower
800 Boylston Street
Boston, MA 02199
T: (617) 951-7000
F: (617) 951-7050
joshua.levy@ropesgray.com

Robert K. Hur
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, DC 20006
T: (202) 383-8969
F: (202) 626-3737
rhur@kslaw.com

*/s/ Joshua R. Zuckerman*
Joshua R. Zuckerman